## UNITED STATES, Appellant
### v.
## CROSBY O'NEAL, Sergeant, U. S. Air Force, Appellee
### 1 USCMA 138, 2 CMR 44

[BLACK BOX]

No. 25

Decided February 7, 1952

[BLACK BOX]

LT. COL. Jean F. Rydstrom, USAF, for Appellant.
MAJ. Harry T. Dykman, USAF, for Appellee.

## Opinion of the Court

BROSMAN, Judge:

### I

This case is before us on certificate from The Judge Advocate General, United States Air Force, in accordance with the provisions of the Uniform Code of Military Justice, Article 67(b) (2), 50 USCA § 654.

The accused was tried by general court-martial at Sheppard Air Force Base, Texas, on May 8, 1951, under a specification alleging in substance the making of a false writing in furtherance of a claim against the United States, in violation of Article of War 94, 10 USCA § 1566. He was found guilty thereunder and sentenced to be dishonorably discharged, to forfeit all pay and allowances to become due after the date of the order directing execution of the sentence, and to be confined at hard labor for nine months. In his action taken on June 19, the appointing authority approved the findings, but only so much of the sentence "as provides for dishonorable discharge, confinement at hard labor for six months and forfeiture of all pay and allowances." At the same time he suspended the execution of the dishonorable discharge until the accused's release from confinement or until completion of appellate review, whichever is the later date. Thereafter, the record of trial was considered by a board of review of the service concerned, which affirmed the findings and the approved sentence as correct in law and fact, one member

dissenting. The Judge Advocate General has certified the following two questions to this Court:

(1) Whether, as a matter of law, the record of trial contains evidence of sufficient quantum and quality to support the findings of guilty.

(2) Whether the action of the convening authority, in so far as it pertains to forfeiture of pay and allowances, must be limited in its application to forfeiture of all pay and allowances to become due after the date of the order directing execution of the sentence.

### II

These will be dealt with in the order used above. Because of the nature of the problem before us, the facts of the case are set out in greater detail than would ordinarily be used. From a maze of testimony characterized in varying degree by inconsistency, vagueness, uncertainty, contradiction, and omission, the following items emerge as either conceded, uncontradicted, or otherwise clearly established. On January 17, 1951, PFC Thomas M. Evans, assistant payroll clerk of the 3751st Food Service Squadron, prepared Military Pay Order 224—hereafter referred to as MPO 224. When it reached the office of the Technical Training Wing's Accounting and Disbursing Officer it contained the name of Sgt. Crosby O'Neal, the accused, and indicated that he had been placed on separate rations effective January 10, 1951. Sgt. O'Neal was himself at this

139

time the Squadron's payroll clerk and PFC Evans' immediate official superior. In actuality the accused had not been placed on orders for this purpose and was not entitled to draw separate rations. Thereafter, at the time the month's pay was received by Squadron members on January 31, 1951, the accused immediately "turned himself in on" a discrepancy list. According to the evidence, a discrepancy list is a document prepared in a payroll clerk's office when necessary for the purpose of initiating inquiry in the Accounting and Disbursing Office as to the propriety of the quantum of pay received by persons specified therein. To illustrate, if an airman believed himself underpaid or "short" at the time of payment, he would normally report himself to his payroll office and ask that he be included in the next discrepancy list—and he would be expected to follow the same course if he believed he had been accorded greater compensation than that due him. At the direction of the accused his name was included in such a list by PFC. Evans, who thereafter delivered the paper to the Accounting and Disbursing Office, and with an airman employed therein, checked the pay records of the persons whose names were set out in it. At this time, and pursuant to the usual custom, PFC. Evans prepared "extracts," i. e., explanatory data covering each questioned case and, in the absence of the accused on pass, placed these notes on the latter's desk. February passed without further event, and at its end the accused received pay which included a sum for separate rations. Thereafter, on March 19, 1951, Military Pay Order 278—hereafter referred to as MPO 278 —was prepared by PFC. Evans and when completed by him it bore no reference to Sgt. O'Neal. On the same day, however, the latter's name was added thereto by himself together with a notation terminating separate rations in his instance. At the time of this addition, MPO 278 had already received the approving signature of Lt. Holt, the Squadron Adjutant. Thereafter, too, the date of MPO 278 was changed by the accused from March 19, when it was prepared, to March 21, the date on

**140**

which it actually left the squadron pay office en route to the Accounting and Disbursing Officer.

The foregoing facts, we believe, must be accepted under any interpretation of the evidence. However, certain other testimony was contradicted or is otherwise dubious, and reference will now be made to this together with several explanations offered by the accused, which, while uncontradicted and not inherently improbable, were of necessity unsupported. Although there is no question that the accused initiated the addition of his name to the discrepancy list on January 31, there is conflict as to when he first learned of the reason for the allegedly suspected—and later verified—overpayment. According to the testimony of PFC. Evans, the accused should have learned of the overpayment's cause when he returned from pass on or about February 3, for a statement thereof was included among the "extracts" placed on his desk during his absence. On the other hand, the accused testified explicitly that Evans' note regarding himself did not disclose the fact of separate rations. The accused stated that he did not learn of the basis for overpayment until March 3, when he was asked by a newly-appointed corporal, whose promotion had not been reflected in his pay, to investigate the latter's pay record status. This investigation required, said the accused, that he check MPO 224, among other items, and brought to his attention for the first time the fact that he was on separate rations. This was further supported, O'Neal testified, when five days later he received for verification from the Statistical Control Office a document known as a Cost Code Roster, and there again saw reported the information that he was drawing separate rations. Sgt. O'Neal also testified that on the same day, March 8, he spoke to Sgt. Stroud, Squadron Clerk and his immediate superior, telling him of both the fact and cause of overpayment and suggesting the necessity for action prior to the next payday. The accused further stated that Stroud urged him not to give up a brief leave already planned by the former during the mid-

dle of March and assured him that the matter could be straightened out on his return. Stroud was not called as a witness by either party and appears from the record to have been unavailable at the time of trial. Although internal evidence suggests the addition of O'Neal's name to MPO 224 after execution, both PFC. Evans and the accused deny placing it there. However, the accused freely admitted entering his name with a terminal object on MPO 278. He stated that he felt free to do this without approval by the certifying officer, Lt. Holt, in view of the corrective nature of his purpose and the necessity for prompt action if a March overpayment was to be avoided. In addition, he felt this course to be proper because of a long course of dealing with Holt based on mutual confidence and permitting minor post-approval changes in MPOs by the accused. The accused even testified that, on occasion, the Lieutenant, who was a busy flying officer, had signed MPOs in blank, leaving their subsequent execution entirely to the witness. Lt. Holt, however, specifically denied this latter statement. When asked for his interpretive reaction to finding himself on MPO 224, the accused stated that he had supposed Evans had placed it there in absent-minded error. It is to be observed that Evans' testimony accords with that of the accused to the effect that the former had not verbally informed O'Neal that he was on separate rations, once this fact had been learned by Evans on or near February 2, 1951. Although Lt. Holt testified on direct examination that the accused's name was not on MPO 224 at the time he signed it as certifying officer, this was considerably weakened on cross by admissions that he did not ordinarily check MPOs "word for word" before signature, and that he had told the investigating officer in the present case that he did not remember "looking at Military Pay Order 224 over (sic) too closely." The record is uncertain as to who delivered MPO 224 to the certifying officer for signature or thereafter to the Accounting Office, although the accused testified that he delivered personally MPO 278 to the Accounting Office.

In the interest of affording a complete evidential picture, reference will be made in conclusion to certain physical characteristics of MPOs 224 and 278. NME Form No. 114, Military Pay Order, consists of a sheet of white paper the body of which is unlined horizontally but divided longitudinally into four sections headed respectively from left to right as follows: "Service No.," "Last Name—First Name—Middle Initial," "Reason for Change," and "Year (From—to—)." The evidence discloses that payroll clerks were instructed to single-space entries bearing the same remark and to double-space entries bearing different remarks—that is, verbal descriptions of reasons for change and the like. As delivered to the Accounting Office, MPO 224 bore entries covered by four different remarks. The first dealt with ten airmen recently promoted to corporal by a named paragraph of Base Headquarters Special Orders. The second dealt with a single airman who had just completed three years of service. The third had to do with another airman for whom the descriptive remark read "lv rat," and the final remark took the form of "Sep rats" and covered three airmen, the second of whom in order of entry was the accused. The usual spacing procedure was fully carried out, as the MPO was finally submitted, in that the first ten entries were single-spaced, and double-spacing appeared between this group and the single name covered by the second remark. This latter in turn was separated from its successor by double-spacing, and the same is true as to this successor and the final group of three names containing the accused's and covered by the remark "Sep rats." It is to be observed, however, that if PFC. Evans' account of the transaction is to be accepted, he did not follow lay-out instructions at the time he prepared MPO 224, for had he done so there would have been no space for the subsequent insertion of the accused's name between the ones above and below it— each described by the same remark and each bearing the legend "Sep rats."

MPO 278 is considerably longer and more diversified than its predecessor.

Since its description would be more complex and is at the same time unnecessary, mention of its contents in similar detail will be omitted. Suffice it to say, however, that as prepared by PFC. Evans the instructions as to spacing mentioned above were carried out. However, a contrary result was produced when the accused admittedly added his name to the document following original execution. This addition was made immediately above the name of one Sgt. Ramzy, the only airman initially included in the MPO for separate rations, and it consumed the space proper under the instructions between the Ramzy entry and its immediate predecessor. Final reference should be made to the fact that the initial alignment of Sgt. O'Neal's name on both MPO 224 and MPO 278 suggests that each was added following original preparation. This suggestion is borne out as to MPO 278, of which the original is an exhibit in the record, by a palpable difference in shade of typewriter ribbon. This additional verification is not possible in the case of MPO 224 for the reason that a contemporaneous carbon copy, and not the original, was used as a trial exhibit and is bound with the record.

### III

Pretermitting, as unnecessary, any consideration of either the necessity for, or the existence of, proof of presentation under the language of the specification, we shall concern ourselves here only with the sufficiency of the evidence to sustain the findings of guilty of making the false writing—the core of the offense as alleged. See Article of War 94, supra, and the Manual for Courts-Martial, 1949, pp. 249–50, 324. In view of corroborated and uncontradicted testimony establishing that the accused initiated action to place his name on a discrepancy list, and thus affirmatively questioned the quantum of his January pay on the very day of its receipt, it is inconceivable as a matter of logic as applied to normal human conduct that he could have been found guilty by the court-martial as charged in this case on any theory other than that he placed his name on MPO 224 with fraudulent intent and thereafter

142

repented or for other reasons sought to sever the thread of misconduct he had begun to spin. No other theory can possibly reconcile the act of making the entry—necessarily found by the court—with the utterly inconsistent fact of questioning its validity with dispatch and effectiveness. We shall, therefore, direct our attention to the question of justification for the findings of guilty under this theory of the case—despite the proffer of more involved, elaborate and finespun explanations.

Certainly the evidence in the case—documentary and otherwise — establishes that someone placed the accused's name on MPO 224, and in our opinion as well, that it was placed there either after original execution or with intent to create this impression. The accused had opportunity indeed to have performed this act and so had PFC. Evans. These two, in truth, were closest to the document and its confection. Beyond them so far as we know, and slightly removed in objective terms of odds, doubtless stands Sgt. Stroud, the Squadron Clerk. Somewhat to his rear may be found Lt. Holt, the Squadron Adjutant, possibly the Squadron Commander, and various other persons unknown in decreasing order of probability. PFC. Evans denied all knowledge in the premises—and so did the accused. Sgt. Stroud was not called as a witness and Lt. Holt was not interrogated on the point specifically. No other elimination was attempted. Certainly, too, the accused possessed a motive for placing his name on MPO 224: he was the only person who could derive direct financial benefit from the transaction. However, it does not follow from this that different motives—undeveloped or underdeveloped at the trial—might not have been entertained by others. An example of the latter is found in the possibility of involvement on the part of PFC. Evans. In the first place, the evidence developed that, in service parlance, Evans was "bucking for payroll clerk." Moreover, by his own statement—although closely associated and on supposedly friendly terms with the accused, his superior—he consciously refrained from informing the accused orally of

the reason for his suspected overpayment. Finally, he admitted under cross-examination to having told a story to the investigating officer inconsistent with his trial testimony—and defended at the trial by pointing out that "I wasn't under oath then," and "I might not have been telling the truth" at the time. Manifestly the present comment is made not at all for the purpose of attributing guilt to Evans, but rather to illustrate the possibility of motive on the part of another than the accused.

It is quite clear to us, however, that both opportunity and motive on the part of the accused were present in this case. Beyond this we are in grave doubt—for apart from the possible inference arising from the quite loose similarity between the method of adding the name of the accused to MPO 278, admitted by him, and that suggested as having been used in the case of MPO 224, there appears little to support the ▮ findings save suspicion, conjecture, and speculation. It is clear and obvious, of course, that these latter may not be used as the basis for fact-finding action. Curley v. United States, 160 F2d 229 (C. A. D. C. Cir.); Kassin v. United States, 87 F. 2d 183 (C. A. 5th Cir.). It is true that in an apparent attempt at realism it has been suggested loosely in a few civil cases that an element of conjecture is involved in every jury determination. Perhaps this is true, if the term "conjecture" be forced away from all semblance of its normal meaning. Words mean nothing in themselves; we have no desire to bog down in a morass of verbalism; and we regard the semantic aspect of the matter as of little importance into the bargain. Regardless of agreement with it, we believe our meaning in expressing our evaluation of the evidence in the present case is abundantly clear. In any event, we suspect that it is one thing to "speculate" in a situation of civil private law, and quite another and more serious one to do so in a criminal case with its requirement of proof beyond a reasonable doubt.

## IV

As we said in United States v. McCrary, (No. 4), 1 USCMA ▮ 1, 1 CMR 1, decided November 8, 1951:

"It is the cardinal rule of law that questions of fact are determined in forums of original jurisdiction or by those which are expressly granted the authority by constitution or statutes. Usually, appellate tribunals are limited to correction of errors of law."

It is entirely clear that the Congress intended to adopt the point of view expressed above as to this Court and did not propose to extend review by us to questions of fact. No one disputes this so far as we are aware. The Uniform Code of Military Justice, Article 67(d), supra, expressly and clearly limits review by this Court as follows:

"The Court of Military Appeals shall take action *only with respect to matters of law*." (italics supplied)

Among other principles of law relevant to the problem before us is that providing in substance that ▮ the evidence in a criminal case must establish beyond a reasonable doubt that the accused is guilty of the offense charged. To this must be added, of course, the related proposition, often clothed in varying verbiage, to the effect that the evidence in such a case must exclude every reasonable hypothesis save that of guilt. All of these considerations were recognized by us in United States v. McCrary, supra, together with the observation that the two last mentioned rules exist primarily for the guidance of trial forums. However, we should not have said there, we did not intend to say there, nor did we say there, that their administration by such agencies is above and beyond the supervision of an appropriate appellate tribunal—by this Court, in fact, although limited to "action only with respect to matters of law." To hold the converse would effectively deprive appellate courts, including this one, of any sort of effective control over subordinate elements of the judicial

scheme in an important area of law administration. That this and other related and proper matters were recognized by us is evident in the following language used by Latimer, J., the organ of the Court in the McCrary Case, supra:

"In stating this rule [requiring substantial evidence to support a verdict] we have not overlooked the converse principle that *where there is no substantial evidence in the record to sustain the conviction the appellate court will set it aside. While this latter rule in a sense permits this Court to weigh and evaluate the testimony for the purpose of testing its sufficiency for a limited purpose,* it does not permit us to substitute our judgment for that of the triers of fact which, under the present military law, are the courts-martial and the boards of review." (italics supplied)

Our possession of power to function in this area—to "supervise" if you will —has been challenged. Again we have no wish to lose our thread in a quibble over semantics. However, we entertain no doubt whatever of the authority of a court, trial or appellate, to pass on the reasonableness of a jury's inferences— and particularly do we believe this to be true in a criminal setting. Likewise we are certain of our own ▌ ■ authority to perform this essential protective function as regards the inferences of a court-martial—and this is quite unaffected by a clear legislative directive away from fact-finding power. That this was recognized long ago by no less a legal scholar than James Bradley Thayer is evident in the following quotation from his classic, A Preliminary Treatise on Evidence at the Common Law, found on page 207 and following:

"In the exercise of their never-questioned jurisdiction of declaring the common law, during all the long period of its secular growth in England and America, there has arisen constant occasion for specifying the reach of definite legal rules, *and so of covering more and more the domain of hitherto unregulated fact.* This has consisted, in a great degree,

in declaring the scope and operation of sound reason, wherein the common law so largely consists. With the growth of knowledge and human experience, and with the multiplied new application of maxims of reason and sense to combinations of fact, both new and old, the judges, in such a system as ours, are thus forever advancing, incidentally, but necessarily and as part of their duty, on the theoretical province of the legislator *and the juryman.*

"Especially has this function come into play in *supervising and regulating the exercise of the jury's office.* Herein lies one of the most searching and far-reaching occasions for judicial control—*that of keeping the jury within the bounds of reason.*" (italics supplied)

It is probable that Thayer was thinking principally of the trial judge, rather than his appellate colleague, when he used the language of the quoted passage. It is also arguable that 'the power of a court of review to reverse a trial court and order a new trial should be and is somewhat narrower than the corresponding power of a trial court of the civilian system. However, we also recognize the presence in an appellate tribunal of broad authority to regulate the conduct of the trial judge as well as that of the jury. He—the judge— may be "supervised" in the performance of his official functions by an appropriate appellate bench just as the same agency may "regulate" the jury in the prosecution of its duties. This truism is given expression in the following quotation from Dean Leon Green's perceptive volume, Judge and Jury, at page 380:

"Probably the strangest chapter in American legal history is how in the short period of the last fifty or seventy-five years, the same period during which trial courts were losing most of their power, *the appellate courts have drawn unto themselves practically all the power of the judicial system.* The early appellate court, made up as it was of a group of trial judges, neither had nor sought a dominant position in the judicial sys-

tem. From the moment that the appellate courts became a separate organization from trial courts, a silent and probably unconscious struggle for supremacy began, which has resulted not only in complete subordination of trial judges but also of juries. It was a development made necessary by the *unhealthy ascendancy that the jury had obtained over the trial judges*. It may be regretted that this dominance of the appellate courts has carried along with it the too great overshadowing of the trial judge, but inasmuch as he was already a captive, his further loss of power has not made a great deal of difference. At least he now may be, and often is through the grace of an appellate court, allowed the freest hand he has ever known in this country, but not through any extensive power he may call his own. This does not mean that a trial judge of great capacity will not be accorded the greatest leeway in the direction of his court, *but it does mean that his actions may be supervised at every step*." (italics supplied)

It is entirely possible, of course, that both of the learned authors quoted might disagree as to the propriety of the degree of supervision exercised by a particular court of review over either judge or jury in a given case. We are not at the moment aware of their general views in this area, nor at this point are we concerned with them. Rather we are interested in their assurance that courts do have authority to supervise juries in the administration of their official functions. The standard to be applied is another matter—and one to which we will address ourselves subsequently.

This authority—nay duty—on the part of the appellate judiciary to supervise the administration by trial courts of the rules with regard to quantum of evidence, reasonable doubt, and balanced hypotheses is widely recognized by courts other than ourselves, and was given the following phrasing by the court in United States v. Litberg, 175 F. 2d 20, 21 (C. A. 7th Cir.) :

"On the other hand, while the trier of the facts is entitled to draw all reasonable inferences from the circumstances in proof, a court of review *is charged with the responsibility of determining the reasonableness of such inferences*." (italics supplied)

Also the following language was used by Murphy, J., in the majority opinion in Mortensen v. United States, 322 U. S. 369, 374, 88 L. ed. 1331, 1335, 64 S. Ct. 1037 :

"But we have never hesitated to examine a record to determine whether there was any competent and substantial evidence fairly tending to support the verdict. . . . Our examination of the record in this case convinces us that there was a complete lack of relevant evidence from which a jury could properly find or infer, *beyond a reasonable doubt*, that petitioners transported the girls in interstate commerce 'for the purpose of prostitution or debauchery' within the meaning of the Mann Act." (italics supplied)

Involving, as it does, the question of scope of review in this Court as to sufficiency of evidence as matter of law, the instant case sets for us a double task. In the first place, we must essay the expression of a standard of measurement—fully realizing the limitations of language for the purpose. In the second, we must apply to the present facts the yardstick accepted. Each of these is an impressive assignment. The first is important because in executing it we shall at the same time provide a solvent for the immediate problem and lay down a rule for future cases. The second is equally serious because in its performance we are required to take action gravely affecting the interests of an individual—the accused, O'Neal. Let us proceed to a determination of the standard to be used.

Historically in England the jury was the final arbiter in matters of fact—principally because it was originally composed of the very persons who knew at first hand the data in question. As the jury became more remote from the occurrences in issue, the necessity for

judicial control became apparent—and numerous methods for attaining this object were readily devised. Beginning with the rude practice of attainder through the writ of error to new trial and special verdict, these are well known, and detailed reference to them will be omitted in the interest of conserving space. Narrowing our inquiry to the United States and to the specific problem before us, we meet the widespread use—until the middle of last century—of the so-called scintilla rule. To some extent the broad early use of this standard stemmed from the conclusive effect accorded jury findings by the ancient common law, without, be it remembered, the protections implicit in the English juristic and social scenes. However, in larger part it derived from the relative positions of the judge and the jury under the conditions of American pioneer democracy. Reference is here implied to the special community respect accorded juries in this setting and the fear of incurring criticism on the part of a predominantly elective judiciary, trial and appellate. Traditionally American judges have been timid in the presence of juries to an extent unknown to the British bench, and their reasons are at one patent and practical. Undoubtedly this phenomenon was in Dean Green's mind when he referred in the passage already quoted from his essays, entitled Judge and Jury, to the "unhealthy ascendency that the jury had obtained over the trial judges." Again, in the same volume at page 385 he has the following to say on the same general subject:

"But the refusal to accept additional power [to find facts] at this point must not be taken too seriously. The courts did not need it; they had already developed all the machinery necessary for jury control without undertaking the laborious work of fact weighing, and to have taken over this responsibility would not only have added to their burdens and have crushed the jury at a point where the judges desired to utilize it, *but would also have destroyed the jury's usefulness as an absorber of public criticism,* as already pointed out." (italics supplied)

During the period beginning about 1850 and ending early in the present century virtually all American jurisdictions rejected the narrower scintilla rule and moved to the broader scope of review contemplated by the substantial evidence rule. It is of interest to inquire into the probable meaning of the latter term. Construed grammatically, the words might conceivably, but not reasonably, mean something just merely beyond the limits of the mere scintilla of evidence formerly regarded as sufficient to block a motion for a directed verdict. At the far swing of the pendulum however, the term may—if one is willing to strain sufficiently—be construed to require a weighing of the testimony, a balancing of the persuasive effect of the evidence on the one side of the material issues against that on the other. If this interpretation be adopted, no evidence would be deemed "substantial" unless, on examination of the whole record, substantial "rightness" should exist in the mind of the reviewing court. We are quite sure that neither of these constructions should be adopted, and we recognize the existence of any number of intermediate positions between the two stated extremes. In more recent years an approach to the problem, possibly borrowed originally from the language of instructions, has been adopted by appellate tribunals—and widely used in federal courts. Occasionally called the reasonable hypothesis rule, this approach applies the standard of the reasonable man to the determination of whether the evidence excludes every reasonable hypothesis save that of guilt. Whether this approach be regarded as establishing a new rule in competition with that demanding substantial evidence, or whether it is merely a specific application of the older principle is a matter of no final moment here. It is to be observed, however, that it seems to embrace a somewhat broader scope of review than does the substantial evidence rule as interpreted by some courts.

V

Certainly the findings of guilty in the case at bar were supported by some evi-

dence. It is difficult to conceive of a case which has run the gauntlet of pre-trial protective devices and reached the stage of trial by military court-martial in which there is no shred of evidence of guilt. But this is not enough. In addition, the evidence necessary for the conviction's survival must be substantial. But even this is not enough, if by the term is meant but barely more than some—i.e., a scintilla—and meant as well that substantiality is necessarily to be discerned by observation through spectacles directed at only one presentation of the controversy. Of course, a court in the position occupied by us at present should look largely at the case for the government, but it is not required to ignore completely the bipartite nature of the judicial transaction, and, indeed, is permitted to take into account in a proper case other elements of the evidential structure, and to arrive at a conclusion as to sufficiency in these terms. This, of course, is what we meant in the McCrary case, supra, when we said that we were permitted "to weigh and evaluate the testimony for the purpose of testing its sufficiency." True it is that our purpose in such case is a very limited one, but it is the one which moves us now. Thus we cannot accept the findings in the instant case as reflecting a conclusion based solely on disputed facts; and along with the undisputed facts we must weigh O'-Neal's uncontradicted and not inherently improbable testimony. See Gallegos v. State of Nebraska, 342 U. S. 55, 96 L. ed. 86, 72 S. Ct. 141.

True it is, too, we recognize, that in speaking thus we are, like many other federal tribunals, laying down a slightly broader rule than is reflected in the language of some courts. At the same time we intend consciously to avoid the breadth of appellate function assumed by other authorities. In any event the view we take is the one we regard as demanded by the realities and the necessities of the military judicial system of which we are a part. In our opinion the adoption of any narrower conception would be ill-considered and inappropriate to the mission of this Court. Moreover—considered from the standpoint of practical operation, as divorced from any question of verbalization—we submit that in actuality this binocular approach is implicit in the very idea of balanced hypotheses, a notion well settled in many federal courts as is reflected in the following judicial language from Towbin v. United States, 93 F. 2d 861, 866 (C. A. 10th Cir.):

"In Bishop v. United States, 8 Cir., 16 F. 2d 410, 416, it is said: 'This court has often taken the position that, where the evidence in a case is as consistent with innocence as with guilt, a conviction cannot be sustained. In Grantello v. United States, 3 F. 2d 117, 118, this court said: "Unless there is substantial evidence of facts which exclude every other hypothesis but that of guilt, it is the duty of the trial court to instruct the jury to return a verdict for the accused; and where all the substantial evidence is as consistent with innocence as with guilt, it is the duty of the appellate court to reverse a judgment of conviction."' [citing cases]." (italics supplied)

The following state of the authorities is reported in the concurring opinion in the case of Leslie v. United States, 43 F. 2d 288, 289 (C. A. 10th Cir.):

"But we cannot agree with the statement in the opinion that: 'It [the government] depended for conviction on circumstances, and in view of the contrary evidence they might reasonably be considered as consistent with his innocence. The jury should have been left free to decide the issue.' If they are so consistent the trial court should have directed a verdict.

"The rule is stated in many ways, one of which is: [quoting the language from the Grantello case set out above].

"There are so many cases from the Eighth Circuit that it is needless to cite them all. A considerable number of distinguished jurists from the circuit approved of the rule, and none ever dissented. A few of the cases are: [citing numerous cases].

"A glance into the Digests discloses that the First Circuit has so held:

[citing a case]. Also the Second: [citing cases]. Also the Third: [citing cases]. Also the Fourth: [citing a case]. Also the Court of Appeals of the District of Columbia: [citing a case].

"In 16 CJ 763, the rule is stated: 'In order to sustain a conviction on circumstantial evidence, all the circumstances proved must be consistent with each other, consistent with the hypothesis that accused is guilty, and at the same time inconsistent with the hypothesis that he is innocent, and with every other rational hypothesis except that of guilt.'

"Cases are cited from thirty-nine jurisdictions in support of the text. No contrary authority is cited.

"The rule is right. The government must establish guilty. The court must direct a verdict if no substantial proof of guilt is offered. When the proof rests on circumstances which lead as rationally to the conclusion of innocence as of guilt, there is no proof of guilt, and nothing to go to the jury. Juries are not permitted in civil cases to speculate as to the negligence of the defendant (A., T. & S. F. Ry. Co. v. Toops, 281 US 355, 50 S Ct 281, 74 L ed 896, and cases there cited); they should not be permitted to guess at the guilt of a defendant in a criminal case." (italics supplied)

These cases appear to establish fully the presence of substantial authority to the effect that if a reasonable inference other than that of guilt may be drawn from the evidence, a trial court should direct for the accused, and in a proper case an appellate court should reverse a conviction. The question now arises: the yardstick of whose judgment is to be applied in the solution of this problem? Or to put it somewhat differently, must we reverse if reasonable men cannot agree on the balance of hypotheses? Or are we required to sustain unless reasonable men would agree that a rational hypothesis other than that of guilt may be drawn from the evidence? Our answer to the inquiry's first form is that our judgment, as such, is not the standard for application, but rather

our conception of the judgment of reasonable men. And our response to its second is that we must not reverse unless we believe that reasonable men would be in accord in holding that a rational hypothesis other than that of guilt may be drawn from the evidence. We regard these as manifestly the more rigorous standards, and for that very reason—and in these premises—the only proper ones. We believe this view is supported by the quotation set out below. It is from Stoppelli v. United States, 183 F2d 391, 393 (CA9th Cir):

"It is not for us to say that the evidence was insufficient because we, or any of us, believe that inferences inconsistent with guilt may be drawn from it. To say that would make us triers of the fact. We may say that the evidence is insufficient to sustain the verdict only if we can conclude as a matter of law that reasonable minds, as triers of the fact, must be in agreement that reasonable hypotheses other than guilt could be drawn from the evidence."

### VI

Applying the principles developed above to the case at bar, we are firmly of the opinion that the findings of guilty and the sentence must be set aside as based on insufficient evidence. Accordingly The Judge Advocate General's first certified question is answered. This action is predicated on the view that the complex of evidence before the court-martial simply did not permit the determination of guilt of the accused beyond reasonable doubt within the fair operation of a reasonable mind. In reaching this conclusion we are aware of no sort of inconsistency with our holding in the case of United States v. McCrary, supra. There the only real issue before the court-martial was that of intent. Here the sole issue involves the performance or the nonperformance of an act. We have applied to the determination of both cases an identical approach of legal principle. That we reached differing conclusions in each is solely the product of essential differences of fact.

## VII

Although not strictly necessary in view of our determination of the first certified question, we will now deal briefly with the second inquiry. It requests our opinion as to whether the action of the convening authority in this case, in so far as it has to do with forfeitures, must be limited in its application to pay and allowances to become due after the date of the order directing execution of the sentence. Reference has been made in an earlier portion of this opinion to the fact that the sentence of the court-martial as regards forfeitures was that the accused forfeit all pay and allowances "to become due after the date of the order directing execution of the sentence." However, in his action taken thereafter the convening authority approved only so much of the sentence "as provides for dishonorable discharge, confinement at hard labor for six months and forfeiture of all pay and allowances."

The solution of this problem presents no difficulty. The convening authority approved the sentence in the case at bar on June 19, 1951, and the order directing execution of the sentence bears this same date. Under any view of the authorities, of logic and of the facts, a forfeiture of all pay and allowances in this case is a greater penalty than a forfeiture of all pay and allowances to become due after June 19, 1951. See Manual for Courts-Martial, 1949, paragraph 116g and Appendix 9; Uniform Code of Military Justice, Article 57(a); Manual for Courts-Martial, United States, 1951, paragraph 126h(5). As such it is expressly forbidden by an ancient principle of military law administration set out in both the Manual for Courts-Martial, 1949, paragraph 87b, under which the accused was tried, and the Manual for Courts-Martial, United States, 1951, paragraph 88a, in effect at the time the convening authority acted in the case at bar. This principle is to the effect that such an officer may not "add to the punishment imposed by a court-martial." To the extent to which this may be taken as having been attempted, but only to this extent, the action of the convening authority is vain, nugatory, and without legal effect.

It has been urged upon us that the language of the convening authority's action should be viewed as having been used in hasty error, that his intention to act in accordance with law should be presumed, and that the phrasing adopted by him should not be interpreted in such a manner as to produce irregularity. It is manifest that an acceptance of this position will produce the very result reached above on other reasoning. In view of the relative unimportance of the present problem and its probable transitory character, it does not seem necessary to elect between these two approaches in responding to The Judge Advocate General's second certified question. In either event, it is clear that the action of the convening authority as to forfeitures must indeed be limited in its application to pay and allowances to become due after the date of the order directing execution of the sentence, that is, June 19, 1951.

For the reasons set forth herein the decision of the board of review is reversed and the charge will be dismissed.

QUINN, Chief Judge, (concurring):

I concur. I have some slight reservations about the distinction made between this case and the McCrary case. The result reached appears to support my position in the McCrary case.

LATIMER, Judge, (dissenting):

I dissent.

In view of the fact that I believe the opinion of the Court announces a rule which permits us to invade the province of the court-martial and weigh the evidence to arrive at a result, a function which Congress specifically denied us, I am compelled to dissent.

Before dealing with the principal issue involved, I desire to divorce myself from two concepts which, while unnecessary to the decision, seem to announce questionable principles. The first is found in the following language: "However, we should not have said there, we did not intend to say there, nor did we say there, that their admin-

istration by such agencies [trial forums] is above and beyond the supervision of an appropriate appellate tribunal—by this Court, in fact, although limited to 'action only with respect to matters of law.'· To hold the converse would effectively deprive appellate courts, including this one, of any sort of effective control over subordinate elements of the judicial scheme in an important area of law administration."

I know not whether the words "supervision" and "control" are used in their ordinary sense, but if so, then this Court assumes far more power than I can find delegated by Congress, and more than other appellate tribunals which have not been given such sweeping authority by legislation. Courts-martial and boards of review are the fact-finding bodies of the military system and they are free to determine questions of fact independently and without interference, control, or supervision by this Court. While our decisions, on matters of law, are binding on them, we do not direct their fact-finding activities · and we should not attempt to do so. Moreover, they should not be led to believe that we might have the power to interfere as this has a tendency to destroy their independence. If I have misunderstood the principles enunciated and if all the Court intends to convey by the quoted language is that we have the right to review the record to determine whether there is some substantial evidence to support the finding, then I have no reason to disagree. But I˙ am concerned that the concepts go much further than that when the majority of the Court seeks to fortify the principle by relying on authorities treating with the powers of trial judges. I believe it is generally accepted doctrine that trial judges have much greater latitude in granting new trials on the weight or sufficiency of the evidence than do appellate tribunals. Accordingly, if we see ourselves as trial judges and operate on that theory we shall soon become an appellate jury.

The second concept is exposed in these words: "In· addition, the evidence necessary for the conviction's survival must be substantial. But even this is not enough, if by the term is meant

**150**

barely more than some — i.e., a scintilla —and meant as well that substantiality is necessarily to be discerned by observation through spectacles directed at only one presentation of the controversy."

We are already plagued with a difficult problem in differentiating between "some substantial" evidence and a "scintilla of" evidence; and now, we are given "barely more than some" evidence to measure. Is this measure between a scintilla and some substantial evidence; or, is it in excess of the latter? Or, is it a method by which this Court is lifted to a preferred status and placed on a different level from that of other appellate courts in that we become a fact-finding body by the simple expedient of creating standards of quantity and quality which are higher than those of other judicial systems? ·

I would have no hesitancy in arrogating to this Court greater powers than are enjoyed by other federal appellate tribunals if I were of the opinion that Congress had intended to grant us that power: However, the Congressional hearings and the provisions of the Uniform Code of Military· Justice force a contrary conclusion. It can be argued that because members of courts-martial and boards of review are military men they are more inclined to find facts against an accused than are civilian jurors, and that for this reason we must require a higher degree of proof to convict than do civilian courts. Assuming, but not admitting, that the inclination to more readily resolve facts against the accused is a vice of the military system, it was one which was well known to members of Congress, and had they determined that the triers of fact were using an improper standard because of their military status they should have granted us the right to weigh the evidence. As I shall point out, Congress specifically denied us this power; and, this being a matter of policy, it·is controlled by Congress not by this Court.

Article 67 of the ˙Uniform Code of Military Justice, 50 USCA § 654, contains the following provision:

"The Court of Military Appeals

shall take action only with respect to matters of law."

This provision was written in the Act after thorough debate before, and careful consideration by, the subcommittees of both Houses. I quote from page 1270 of the Report of Hearings before the Armed Services Subcommittee of the House, Index and Legislative History, Uniform Code of Military Justice. The article being discussed was Article 67:

"The Judicial Council [now this Court] takes action only with respect to matters of law. In this, it differs from the final appellate tribunals now set up in or proposed for the Departments."

In the Report of the Senate Committee on Armed Services, supra, p 29 the same language is used.

Professor Edmund M. Morgan, Jr., of the Harvard University Law School, who was chairman of the special committee selected to draft a proposed uniform code of military justice in 1948, in making his report to the subcommittee of the House of Representatives, made the following statement in answer to a question by Representative Durham. I quote from page 609 of the House Hearings:

"Mr. Durham: Who passes on the question of law?

"Dr. Morgan: Why the judicial council [Court] would. That is, the court of last resort would determine whether it was a question of law or a question of fact. And as you probably know, Congressman, it is a question of law *whether. there was any evidence upon which the tryer of fact could reasonably find a defendant,* [sic] *as in the civilian court.*

"Under our system, they would not pass on the weight of the evidence in the sense that they could set aside a finding because they thought it was against the weight of the evidence. *They could set aside a finding of guilty only in case there was no evidence* —". (italics supplied)

A fair reading of the Act and a study of its legislative history clearly points to the principle that Congress intended to place this Court on the same plane and with the same limited power of review as that possessed by the United States Courts of Appeals. I can find nothing recorded which would indicate that we were to place ourselves on a different level for fact-finding purposes. On the contrary, I can cite at least six places in the recorded proceedings of hearings before the committees of Congress where attention was called to the fact that this Court was being handicapped by limiting its review to questions of law. In the interest of brevity, I quote from only one witness:

"In the legal profession there has always existed great dissatisfaction with the limited power of the circuit court of appeals in criminal cases, which refuses to disturb a verdict if there is substantial evidence to support it. In view of the fact that this proposed legislation is curative in nature, it is submitted that the expansion of the authority of the Military Court of Appeals over facts will be a most important element of the proposed reforms." (Senate Hearings. p 188, supra).

Accordingly, if we hold that we can weigh the evidence on scales tilted in favor of the accused then we become the third fact-finding body in the military judicial system and legislate unto ourselves powers which a fully informed Congress specifically refused to grant.

In summation of my arguments on this point, I contend the Court's opinion concedes that Congress, by express words, limited this Court to questions of law, but then escapes the effect of the limitation by adopting an artificial standard of. proof which permits a review of the evidence, not for the purpose of determining whether there is some substantial evidence to permit reasonable men to return a finding of guilty, but for the. purpose of determining whether there is sufficient to fill a mold which is tailored to meet this Court's specifications.

Based upon my belief as to our proper function, I argue, as I did in the case of United States v. McCrary, (No. 4), 1 USCMA 1, 1 CMR 1, that certain

principles of law are for the guidance of trial tribunals, and that they do not necessarily fit in the scheme of appellate procedure. In this connection, I have special reference to the rule which is quoted in the Court's opinion to the effect that there must be substantial evidence which excludes every other hypothesis but that of guilt, and that the evidence must establish the guilt of the accused beyond a reasonable doubt. Admittedly, these principles have been announced by appellate tribunals, and it is difficult to reconcile many of the statements made unless they are interpreted as guides to be used by fact-finding bodies.

Rather than discuss the cases cited in the Court's opinion, I am going to set out the principles which ought to guide us in considering cases on review. In support of these principles I shall quote from some cases which specifically pass on the power of an appellate court to review questions of fact. I am convinced that the better rule to be used by this Court in circumstantial evidence cases is this: If there is some substantial evidence in the record which permits the court-martial to conclude the accused is guilty beyond a reasonable doubt then we are not permitted to reverse because we might or can draw a different conclusion. This rule might appear to clash head-on with the principles of law which deal with the proposition that the evidence must exclude every reasonable hypothesis of innocence. If so, then I prefer to follow the former, as I believe the after-cited cases, which support that rule, announce the more persuasive reasoning.

In Curley v. United States, 160 F2d 229, 232, the court stated:

"It is true that the quoted statement seems to say that unless the evidence excludes the hypothesis of innocence, the judge must direct a verdict. And it also seems to say that if the evidence is such that a reasonable mind might fairly conclude either innocence or guilt, a verdict of guilt must be reversed on appeal. But obviously neither of those translations is the law. Logically, the ultimate premise of that thesis is that

if a reasonable mind might have a reasonable doubt, there is, therefore, a reasonable doubt. That is not true. Like many another rule become trite by repetition, the quoted statement is misleading and has become confused in application.

"The functions of the jury include the determination of the credibility of the witnesses, the weighing of the evidence, and the drawing of justifiable inferences of fact from proven facts. It is the function of the judge to deny the jury any opportunity to operate beyond its province. The jury may not be permitted to conjecture merely, or to conclude upon pure speculation or from passion, prejudice or sympathy. The critical point in this boundary is the existence or non-existence of a reasonable doubt as to guilt. If the evidence is such that reasonable jurymen must necessarily have such a doubt, the judge must require acquittal, because no other result is permissible within the fixed bounds of jury consideration. But if a reasonable mind might fairly have a reasonable doubt or might fairly not have one, the case is for the jury, and the decision is for the jurors to make. The law recognizes that the scope of a reasonable mind is broad. Its conclusion is not always a point certain, but, upon given evidence, may be one of a number of conclusions. Both innocence and guilt beyond reasonable doubt may lie fairly within the limits of reasonable conclusion from given facts. The judge's function is exhausted when he determines that the evidence does or does not permit the conclusion of guilt beyond reasonable doubt within the fair operation of a reasonable mind."

The Supreme Court of Indiana, in the case of Inman v. State, 223 Ind 500, 62 NE2d 627 (1945), stated the rule in the following language (p 628):

"Appellant invokes the rule that in cases where circumstantial evidence is relied on the evidence must be such as to exclude every reasonable hypothesis of innocence. Cavender v. State, 1890, 126 Ind 47, 48, 25 NE

875; Osbon v. State, 1937, 213 Ind 413, 424, 13 NE2d 223; Falk v. State, 1914, 182 Ind 317, 321, 106 NE 354; Robinson v. State, 1919, 188 Ind 467, 471, 124 NE 489. However, it has been held that this rule is applicable to the trial court and not to the consideration of cases upon appeal in this court. Wrassman v. State, 1921, 191 Ind 399, 402, 132 NE 673; Gears v. State, 1931, 203 Ind 380, 394, 180 NE 585; Rector v. State, 1937, 211 Ind 483, 492, 493, 190 NE 172, 7 NE 2d 794."

In State v. Dennis, 159 P2d 838 (1945), the Supreme Court of Oregon stated at page 841:

"The question before this court, however, is not the same as that which was before the jury. We are not directly concerned with the weight of the evidence, nor with the conflicts in the testimony, nor with the credibility of the witnesses. It is our duty to determine if there was sufficient circumstantial evidence of guilt from which the jury, in the performance of its function as triers of the fact, could properly find a verdict of guilty. State v. Rosser, 162 Or 293, 86 P2d 441, 87 P2d 783, 91 P2d 295. We weigh and examine the evidence only to the extent necessary for the performance of this duty."

In People v. Newland, 15 Cal2d 678, 104 P2d 778 (1940), the Supreme Court of California stated at page 780:

"As early as the case of People v. Muhly, 15 Cal App 416, 114 P 1017, the correctness of the statement in the Staples case was questioned and limited, in view of the constitutional provision making the jurors the exclusive judges of the facts. It was there said, 15 Cal App at pages 418, 419, 114 P at page 1018: 'The principle enunciated in the Staples Case is undoubtedly proper to be given as an instruction to the jury. . . . But we do not think it can be accepted, or was intended to be accepted, as a rule of universal application to guide the appellate court in all cases arising out of or dependent upon circumstantial evidence. . . . We do not understand that case to hold that, where the circumstances are such as to reasonably justify the inference of guilt, the case will be taken from the jury because an inference of innocence might also reasonably have been drawn. Between these two inferences the jury must choose, and it is only where the evidence obviously does not warrant the inference of guilt that the court will interfere. This must be so, or the weight of the circumstantial evidence, and the inferences to be drawn from it in almost every case, must finally be determined by the appellate court, thus making the court the arbiter of both law and fact. In our judgment a verdict of a jury, and the judgment of conviction based upon circumstantial evidence, come to us as any other verdict and judgment, clothed with like presumption of support; and, unless we can say that the inference of guilt drawn from the evidence was wholly unwarranted, we cannot interfere.' "

In Abrams v. United States, 250 US 616, 619, 63 L ed 1173, 1175, 40 S Ct 17, the Supreme Court of the United States said:

"The claim chiefly elaborated upon by the defendants in the oral argument and in their brief is that there is no substantial evidence in the record to support the judgment upon the verdict of guilty and that the motion of the defendants for an instructed verdict in their favor was erroneously denied. A question of law is thus presented, which calls for an examination of the record, not for the purpose of weighing conflicting testimony, but only to determine whether there was some evidence, competent and substantial, before the jury, fairly tending to sustain the verdict."

In line with the reasoning of these cases I would not test the sufficiency of the evidence to determine whether I might conclude there was some hypothesis upon which the accused might have been found innocent, but rather I would weigh it to determine whether the inferences which the court-martial could have reasonably drawn from the established facts and circumstances were within the permissible limits accorded

to those bodies which pass on questions of fact.

At times appellate courts, as in this decision, lean heavily on the rule that a jury (court-martial) may not be permitted to reach a verdict based on suspicion, conjecture and speculation. Certainly, no one would contend that such was not the law. But, some appreciation must be given to the application of the rule. Every finding based on disputed questions of fact or circumstantial evidence involves some degree of conjecture and speculation. While the following quotation from the case of Lavender v. Kurn, 327 US 645, 653, 327 L ed 916, 922, 66 S Ct 740, deals with a civil action, no one should quarrel with the rationale expressed therein:

"It is no answer to say that the jury's verdict involved speculation and conjecture. Whenever facts are in dispute or the evidence is such that fair-minded men may draw different inferences, a measure of speculation and conjecture is required on the part of those whose duty it is to settle the dispute by choosing what seems to them to be the most reasonable inference. Only when there is a complete absence of probative facts to support the conclusion reached does a reversible error appear."

The opinion of the Court seeks to avoid the logic of this quotation by stating it is suggested loosely in a civil case and we are here dealing with a criminal matter. I used the statement because I believed it succinctly and nicely announced a principle that is applicable in all types of actions. If it is inapplicable to criminal cases then I ask how any conviction based on circumstantial evidence can be sustained and how conflicts in evidence can be reconciled.

The most I can claim for the evidence in this case is that it is sufficient to permit reasonable men to find the accused guilty beyond a reasonable doubt. I can not say that there is not some speculation and conjecture involved. But, if this Court is to adopt the rule that the evidence must be such as to eliminate those elements, then we would be

154

required to reverse practically all factual cases.

In analyzing the testimony to cast doubt upon the finding of guilty the Court makes two attempts to weaken the government's case, which, I believe, are subject to challenge. The first is that the only possible theory that could sustain the court-martial finding of guilty would be that the accused "placed his name on MPO 224 with fraudulent intent and thereafter repented or for other reasons sought to sever the thread of misconduct he had begun to spin." It may be that I am required to exhibit unusual imagination to set forth other theories, but I believe not. I can at least suggest one. If an accused is conceiving a plan for the purpose of committing a crime, he quite often considers taking some action which strongly points to his innocence. Some act is usually taken which permits him an escape route in the event of suspicion. In this particular instance, if the accused conceived a plan to defraud the government by filing a false claim he could, by the expedient of immediately placing his name on a discrepancy list, cast doubt on his participation. If the falsity were discovered, he could claim good faith in presenting the discrepancy list; and, if it escaped unnoticed, he could benefit by the crime. This is not after-repentance; this is pre-crime planning. I suggest in this connection that regardless of which theory appears the more reasonable, the duty to reconcile the apparent inconsistent conduct is placed on the court-martial and not on this Court.

The second attempt is by attacking the credibility of PFC. Evans. In support of that attack certain of his testimony is quoted to show inconsistent acts and statements. The preceding questions and answers, however, give a somewhat different complexion to this testimony. The Court quotes, that he "was not under oath then," and "I might not have been telling the truth" at that time. The questions and answers which fully develop the matter are as follows:

"Q. Do you recall having conversation on or about 26 March in the

presence of Lt. Holt, Staff Sergeant Stroud, and 2d Lt. Jackson?

"A. I do, sir.

"Q. Do you recall that they had MPO 224 and asked you about it?

"A. That is true, sir.

"Q. Do you recall telling them you didn't think you typed it?

"A. Sir, I wasn't under oath then.

"Q. What did you say?

"A. I said I wasn't going to say.

"Q. Whether you typed it or not?

"A. That is true. I might have said it that way. I will say I might not have been telling the truth."

The questions asked relate to statements made on a pre-trial examination, when criminal responsibility was being pursued. It is possible that PFC. Evans at that time did not care to involve anyone, and therefore, sought not to say who typed the order. It is conceivable at that time he might have been trying to shield the accused. However, when placed on the witness stand, under oath, he was required to answer. Uncertainty was changed to certainty and on cross-examination he was required to explain his inconsistent statements. If he were "bucking" for Sgt. O'Neal's job, a possibility suggested by the Court, it would seem a bit unusual that he would be hesitant about making a disclosure which would have a tendency to incriminate the sergeant. Again, as in the other instance, this deals with the field of inferences which belongs to the court-martial. I mention the testimony not because it is decisive but merely to point up the difficulties encountered when we invade that field.

While I have previously cited cases dealing with the limitations on an appellate court in reviewing evidence, I shall accept any rule quoted in any case cited in the majority opinion and test the sufficiency of the evidence to sustain this conviction by the rule most favorable to the accused as I believe the facts and circumstances do exclude every reasonable hypothesis of innocence. In testing the evidence I will attempt to use the "reasonable man" standard, but I do grant to him the right and duty to judge the facts in the light of standards of human conduct.

In addition, because of the finding of guilty, the firmly established rule that the evidence must be viewed in the light most favorable to the government is used.

All parties to this controversy are in agreement that there is no dispute about certain of the facts and circumstances. These are: That a false claim was presented; that the entry on MPO 224 showing the accused claimed rations was made at a time subsequent to its initial preparation and after it had been signed by Lt. Holt, the certifying officer; that the entry on MPO 278, showing the termination of rations to the accused was placed thereon by him after it had been originally prepared by PFC. Evans, and after it had been signed by Lt. Holt, the certifying officer; that the accused changed the date of MPO 278 after it had cleared the certifying officer; that in placing his name on the subsequent pay order the accused did not show the entry on the retained file copy; that the accused obtained the sum of $68.25 as overpayment for rations during the period involved; that these rations were illegally claimed; that as early as March 3, 1951, the accused knew that he was being paid sums for separate rations not legally due him; that the accused was well trained in the preparation of papers affecting pay, having worked under the old system during the years 1947 and 1948, and under the new system for better than six months; that he was the sergeant in charge of the section; that on the 31st day of January, 1951, he knew the amount of money he received for the month of January was more than the amount he should have received; that on that date he placed his name on a discrepancy list; that ordinarily the procedure followed in preparing and submitting military pay orders was that either the accused or PFC. Evans prepared the order, it was taken by one of them to the certifying officer for signature, was returned to their section and was delivered by one of them to the finance office; that the procedure to qualify for pay for separate rations during the period involved was that a formal request would be submitted to Lt. Holt, the certifying officer, who would in turn sign it, submit it to

**155**

higher headquarters, and a special order would then be published; that no such procedure was followed in this case; that a special order did not accompany military pay orders because the certificate of the certifying officer was sufficient authority for the finance office to make payment; and that a military pay order is an order which authorizes a disbursing officer to open, adjust, or close the pay records of the individuals listed thereon on the date shown in the entry column.

With the foregoing admitted facts as a foundation, we now turn to those in possible dispute. PFC. Evans testified that he did not type the entry on either of the military pay orders; that shortly after the accused placed his name on a discrepancy list he left on a three-day pass; that Evans went to the finance office, got extracts on the discrepancies, and noticed that accused was paid for separate rations; that he brought the extracts of the discrepancies back and gave them to the accused on his return on Monday, which would be the 5th day of February, 1951; that the accused looked them over on that date; that during one of the conversations involving the discrepancies the accused told Evans not to go to finance in connection with them.

Lt. Holt testified that he never signed any blank military pay orders; that the entries affecting the accused were not on the order; and that he never knew of any change having been made on an order unless it was also made on the file copy.

Capt. Robert E. Ashman, investigating officer in the case testified that in a conversation with him, the accused, after having been warned of his rights as required by Article of War 24, 10 USCA § 1495 stated: That an audit team had picked up the discrepancy; that he knew he had to terminate the separate rations because he was not authorized to draw them; and that he chose the time of terminating them.

In explanation of some of the incriminating facts testified to by the previous witnesses, Sgt. O'Neal testified, in part, as follows: When asked why he did not consult with Lt. Holt about typing his name in on military pay order 278, he testified it did not occur to him to ask Lt. Holt; that he had complete control of the payroll; that he made quite a few corrections and initialed them; that Lt. Holt gave him blank military pay orders already executed; and that he could type in any information he wanted on an order. In connection with the extract showing the cause for his overpayment, which PFC. Evans testified he obtained and gave to the accused on February 5th, it is significant to note his answers to the following questions:

"Q. Isn't it a fact you read the extract on you?

"A. I believe I did.

"Q. What did it say?

"A. I have no knowledge as to what it said at that time; it has been four months ago.

"Q. But you had put your name on that discrepancy list?

"A. Yes, sir.

"Q. You didn't care enough to check and be sure what the extract said when it was returned to you?

"A. I did check on it.

"Q. What did it say?

"A. Don't remember. In my opinion, at the present time wouldn't pertain to what it had on it in January. There are several remarks on it now that were not in January.

"Q. You don't remember whether or not that extract revealed why you were overpaid or not?

"A. No, it is not my duty to determine whether I was overpaid."

The accused was also asked to explain why, when he found out on March 3rd that he was being paid for separate rations, he failed to submit a military pay order until the 21st of the month. He testified that he knew he was on separate rations on March 3rd. That on or about that date he consulted Staff Sgt. Stroud who told him he could do that when he came back from leave; that he left on the 8th of March and returned on the 12th; that an inspection team came the 8th, as he was preparing for inspection; that when he came back on the 12th he did not submit any changes because Lt. Holt was not present; that an alternate certifying officer was pres-

156

ent from the 10th to the 19th of March, during which time 14 or 15 military pay orders were signed by him.

One or two other evidentiary matters of importance are these: the accused knew he was overpaid on January 31st, but he claims he did not know the reasons for overpayment. That was his assigned reason for putting his name on the discrepancy list. He knew on February 27th, the day before pay-day that he was being overpaid for that month. A military pay order correcting accused's status could have been prepared and submitted to the finance office on any day up to and including the 25th day of the month.

In stating the foregoing evidence I have made no assumptions; nor have I indulged in any inferences. Each statement can be substantiated by testimony in the record. However, in arguing to support the finding of the court-martial there may be some inferences I shall make, but they will be confined to what I believe to be permissible limits.

Admittedly, a false claim was filed, so we can limit our discussion to the identity of the person committing the offense. This can be established by circumstantial evidence, a well-recognized and convincing method of fixing guilt. In unravelling the web of circumstances, I find only three possible theories as to who might be the perpetrator. One would be that the accused was the offender. The second would fix the responsibility on PFC. Evans. The third would be that someone other than those two presented the claim. I will discuss these theories in the reverse order.

It is conceivable, but highly improbable, that some unknown person, without any apparent motive or benefit to himself, would present a claim to have money paid to a third party without the latter's knowledge. To do so would be contrary to ordinary concepts of human behavior and, in this instance, would require that the person surreptitiously obtain all copies of the documents involved, in the absence of members of the section, and after the documents had been signed by Lt. Holt, then leave them in the section to be delivered to the finance officer by either the accused or Evans. The offender would have to be familiar with rules and regulations governing the finance department, at least to the extent of knowing how to prepare the military pay orders and knowing that the finance officer would pay without a special order having been published. He would be required to know or obtain the full name, grade, and serial number of the accused. The only possible motive that would move him would be to injure the accused and the success of the plan would depend upon the false entry escaping the detection of the accused and Evans and the keeping of the money by the accused. It would be more than unusual to find an unknown person so solicitous for, or so hostile to, the accused. To suspect a stranger might conjure up such a plan and then carry it into execution is being fanciful and imaginary.

I have not overlooked the fact that Sgt. Stroud is included in this class and might have the required knowledge to prepare the entry. However, the facts weighing against his participating are that neither Evans nor the accused testified that he, during the time involved, ever handled the military pay orders. He would not receive any apparent benefit from ruining the accused, and he had no monetary interest in the success of the scheme. He was chief clerk, senior to the accused, and when the latter claimed to have mentioned the discrepancy the only person he reported it to was Sgt. Stroud. When the information was called to the attention of Sgt. Stroud he did not proceed against the accused or appear in the role of persecutor. He told the accused to submit the entry when he returned from leave. There was no claim of ill feeling between the accused and him and no possible motive is suggested. He was not called as a witness because he had been transferred and even in absentia no one attempted to saddle him with suspicion. I challenge any one to judge Stroud in the light of human conduct and see if by "reasonable hypothesis" standards the finger of guilt points towards him. If it does, then it is premised solely on his assignment as chief clerk of the squadron.

The second hypothesis is that Evans placed the name on the military pay order. He was called as a witness and denied he did so. This alone, if believed by the court-martial, would explode this theory as the duty to determine the credibility of witnesses, determine who is telling the truth, and reconcile disputes in the evidence belongs to that body. But, suppose we examine the other facts and circumstances to see if it is reasonable to conclude that Evans was the offender. If he was, it could be only for one of two reasons, namely (1) malice toward the accused in the sense that Evans could be promoted if he discredited the accused; or (2) because he made an error. The record is silent about any ill feeling between Evans and the accused. The latter, when testifying, made no such contention. He testified that if the entries were put on by Evans it was because of error. In order to discredit accused to promote himself ("buck" for promotion), Evans would be required to take a chance that the accused would help in the plan by accepting the additional allowance and by not immediately tracing down the source of the improper entry. If the accused were to start an immediate investigation, the circumstances would encompass Evans as a possible and perhaps the only perpetrator. This appears a rather risky plan to obtain a promotion. Detection would be easy and Evans would not get the promotion, he would get the sentence. There is not one affirmative act on the part of Evans, disclosed by this record, which remotely suggests that he was trying to convict the accused. When he observed the false claim on about the 5th of February, he did not become an informer, he preferred to leave the matter to the accused to straighten out. When the crime was being investigated he refused to state who had prepared the military pay orders. Whether this be considered as a refusal to incriminate himself or the accused, it was not a showing of hostility toward the accused. I can not find one incriminating fact pointing toward Evans as the responsible party, and it is interesting to note that the Court's opinion only infers the possibility of involvement. This possibility is unsupported by evidence unless it be found in the fact that Evans was required, as part of his duties, to type the military pay orders.

A suggestion that it might have been an error on the part of Evans requires little discussion. A full line entry, squeezed in after the completion of the document could not be a typographical error. The person making the entry might have been mistaken about the right of the accused to draw rations, but that could not apply to Evans. The entry was a change in status involving an increased pay for an immediate superior. The change would have to be called to the attention of Evans by a special order as this was the only procedure by which the accused could rightfully obtain pay for separate rations. Had Evans been mistaken about accused's right to draw rations, it seems a bit unusual that he would go to the trouble to making the entry after the military pay order had been certified by the certifying officer, when the same result could have been accomplished by putting it on any of the subsequent orders. Furthermore, while the accused testified he made entries after the signature by the certifying officer because the officer had faith in him he made no claim that Evans was permitted this latitude or that he ever made changes without express authorization. I assert as being unreasonable any hypothesis that Evans was the guilty person, and I wonder what facts, circumstances, and inferences are relied upon by the Court to reach that conclusion.

I go now to the case against the accused, the only person in the drama with a recognized motive. While I do not contend that motive established guilt, it is of great importance, particularly in cases of circumstantial evidence. It assists in fixing the crime upon the proper person. He obtained, kept and, I assume, used the money which was paid because of the fraudulent claim. On January 31st he knew he was overpaid for that month, and as early as February 5th he was furnished with information as to the reason for the overpayment. He makes various excuses for not knowing at that time that it was for separate rations, such as, while

he read the extract of the deficiencies he did not note the entry on himself and he did not inquire about the overpayment as it was not his business to find out. The court-martial was not bound to accept his story, particularly since when he put his name on the discrepancy list to find out why he was being overpaid, and PFC. Evans determined the reason therefor, then when the information was available to accused he neither learned the reason nor cared to find out. Strangely though, he did take the pains to tell Evans not to go near the finance office. His knowledge of being overpaid was widened during the month of February as he knew on the 27th day of that month that he was to be overpaid the next day (pay-day), but again I suppose he had no duty to inquire about the reason for the overpayment.

Supposing up to that date we assume the facts and circumstances are consistent with innocence; and we look at those events happening after the accused admits he knew he was obtaining pay for separate rations. When he discovered that, he had to know that a military pay order containing a false entry affecting him had been forwarded to the finance officer because his claimed source of information was the retained copy. In judging human conduct, failure by words or acts to disclaim participation when confronted with a fraudulent scheme by which one admittedly profits might be influential in determining guilt. These are some of the steps the accused might have taken to bolster his claim that he did not make the entry, and they would have been consistent with innocence. He might have consulted the finance office and informed the finance officer of the overpayment; he might have inquired of the only other man who prepared military pay orders as to his knowledge about the entry; he might have consulted the certifying officer and informed him that someone had falsely added his name to the order after it had been completely executed; he might have informed Sgt. Stroud that some one, unbeknown to him, had placed his name on the order; and when the inspection team appeared

he might have informed the members of the irregularity. Had he taken any one of these steps the chain of circumstances pointing towards guilt might have been broken. But, of course, he took none.

This is what he did as found in the record. Having learned of the false entry on March 3rd, he remained silent, with the exception of telling Sgt. Stroud on March 8th that he hadn't caught up on his separate rations, and that he had to terminate those affecting him; he included his name on the list terminating the extra pay; but it was 18 days after he was fully apprised of his illegal status, although a number of military pay orders were submitted during the period; when he elected to end the preferred status he waited until the military pay order had cleared the certifying officer, as was done on the order constituting the false claim, and then surreptitiously squeezed the entry in between those already on the document; he did not change the file copy so that anyone checking through the file could observe the added entry; he did not request PFC. Evans to put the entry on MPO 278 at the time it was being prepared, although I can find no reason for not doing so unless he was attempting to conceal the matter; he could have included the entry on any military pay order prior to the 25th of the month, yet he elected to alter one which had been completely executed; he changed the date on the military pay order after it cleared the certifying officer because it was retained by him for at least two days after signature; he gives a number of reasons for not having submitted a change when he first discovered the error, such as his leave, presence of the inspecting team, and the absence of Lt. Holt, but fails to account for why he did not give the information to Evans and have him prepare an appropriate change as was done in many other cases during that period; furthermore, he had no reason to wait for Lt. Holt unless he wanted to make some explanation, but unfortunately the record suggests that he did his best to escape having to disclose the false entry to the lieutenant; he told the investigating of-

**159**

ficer that the inspection team uncovered the discrepancy, that he knew he was illegally drawing pay for separate rations, and that he made the entry on MPO 278 because he had to terminate the status; finally, when it came time to fix the date for termination of the excess pay he did not terminate the status on the first of March, or the 3rd of March, he permitted the status to continue and claimed extra pay until the 16th day of March, some thirteen days beyond the date he knew he was being illegally paid. In the final analysis, what the accused failed to do and what he did, with one single exception, unerringly identify him as the offender.

I have attempted to show the evidence, or lack of evidence, and inferences to support the three theories. It should not be difficult to appraise the facts in the light of our limited power of review and determine whether, as a matter of law, we can reverse. I find nothing in the opinion of the Court which discusses in what particulars the evidence is lacking, but viewed from my understanding of what might be a reasonable hypothesis of guilt or innocence, I would say that the court-martial was well within its permissible limits when it selected the hypothesis it did. If that tribunal viewed the acts of the known or unknown participants in this drama, in the light of the standards of human conduct, it reasonably must find, beyond all reasonable doubt, that the accused was the person who prepared and submitted the false entry.