UNITED STATES, Appellee

v.

JOHN W. YARBOROUGH, Private, U. S. Army, and HERMAN
MARSHALL, Private First Class, U. S. Army, Appellants

1 USCMA 678, 5 CMR 106

No. 443

Decided September 12, 1952

LT. COL. James C. Hamilton, USA, LT. COL. George M. Thorpe, USA, 1ST LT. James A. Hagan, USA, and 1ST LT. Michael E. McGarvey, USA, for Appellants.

LT. COL. Thayer Chapman, USA, and 1ST LT. Kenneth A. Howard, USA, for Appellee.

## Opinion of the Court

ROBERT E. QUINN, Chief Judge:

Petitioners Marshall and Yarborough were each convicted, at common trial by general court-martial in Korea, of conspiracy to malinger; malingering; and misbehavior before the enemy. Each was sentenced to a dishonorable discharge, total forfeitures, and confinement for ten years. Army reviewing authorities have upheld the findings and sentence, including the board of review which affirmed without opinion. We granted petition for review limited to the issues of whether there is sufficient evidence to support the findings and whether there is a multiplicity of charges based on offenses arising out of the same transaction.

In order to assess the sufficiency of the evidence, it will be necessary to set out the evidence in some detail.

Private John W. Yarborough, Private First Class Herman Marshall, Corporal Porter W. Phelps, Jr., Private First Class Roscoe B. Shriver, Corporal Edward F. Duckett, and Private First

Class William F. Chapius were, on July 9, 1951, all members of Company H, 5th Infantry Regiment. On that date accused Yarborough sustained a wound described as "wound in a ,toe of his right foot," and accused Marshall was wounded in the index finger of his right hand.

Corporal Phelps, who had been with a section attached to Fox Company on the front line, returned on July 9, 1951, to the command post area, leaving his weapon in the tent shared by accused Yarborough and Marshall, and assembled with Yarborough, Marshall, Campbell, Shriver, Duckett, and Chapius at a spring near the company command post. The men drank beer, after which all but Yarborough left to eat. Later the same evening, at about 7:00 p.m., Marshall, Yarborough and Phelps were in the tent of the accused. Yarborough had placed Phelps' weapon out of the way. Marshall picked up the weapon and pointed it toward his foot, asking Phelps and Yarborough if they dared him to shoot. Marshall then put the weapon down, and Chapius entered with some beer. During the time he was with the accused, Phelps heard each of them say that they were leaving but they did not state when they were going. Phelps recalled Yarborough stating that he might go to Seoul and Marshall replying, "If you do, I will go with you." Neither of the accused mentioned how they were going to Seoul. Phelps did not know whose weapon it was that had·been fired, but stated that it might have been his. His weapon had been fired and was inside the tent after the shooting.

Private First Class Roscoe B. Shriver testified that on July 9, 1951, at about 7:30 p.m., he, Phelps, Chapius, Marshall, and Yarborough were in Shriver's tent. Prior to that time they had been drinking beer at the spring. At noon of the same day Shriver heard Marshall and Yarborough say that they were leaving. While they were in the tent, Shriver saw the accused pick up a rifle in a joking manner and point it at their overlapped feet, talking of shooting each other with one round. Shriver departed to talk with a jeep driver and to await the commencement of a movie. At about 8:30 he heard a shot and ran over

to the place from which it came. He noticed a wound on the hand of Marshall and one on the foot of Yarborough.

Corporal Duckett, a member of the group at the spring, overheard a conversation between Marshall and Yarborough in which each stated that he intended to go to Japan that night and in which each declared that he did not care how he went. Duckett observed Marshall obtain a gun which had been lying behind Yarborough and which belonged to Chapius. Marshall pointed the gun at Yarborough's foot and threatened to shoot. Yarborough told him to "go ahead," that he didn't "give a damn." Duckett remonstrated that they had better not, as all accidents were being investigated, to which the accused replied that it didn't make any difference to them.

Private First Class Chapius, who had been a member of the group at the spring, did not see Marshall do anything with a carbine with relation to Yarborough at that time. During the course of his association with the two accused, Chapius heard each say that they were going to Japan that night and did not care how they went. He also heard them discuss how to shoot themselves and get away with it, though from the tenor of. the conversation he didn't believe that they meant it. He added that it was usual for soldiers to discuss in a joking manner about wounds and returning to Japan.

At about 8:20 or 8:30 p.m., Chapius. Marshall, and Yarborough were alone together in a tent. Yarborough was lying back on his elbows and Marshall was lying on his right side. Chapius observed Marshall place his finger on Yarborough's foot and put the muzzle of the rifle against his finger. Chapius then looked away for a period of about a minute and, during that time, heard the rifle fire. Yarborough jumped up and yelled, "I'm hit." Chapius saw a wound on Yarborough's foot and blood on Marshall's hand. Chapius enacted the positions of the accused to illustrate that Marshall was sitting at a point parallel to the hips of Yarborough, facing Yarborough's foot. Marshall placed his right hand over the right foot of

Yarborough, the palm outward, facing Marshall. The muzzle of the carbine was one inch from the finger of the other hand of Marshall; the stock of the carbine was between his legs. Marshall had his left hand by the stock of the carbine. Chapius did not see Marshall pull the trigger of the gun. Chapius did not know to whom the carbine belonged though he did know that the gun was not supposed to be loaded. He did not observe Marshall examine the rifle to see if it were loaded, and was surprised when the gun fired. Immediately after the gun went off each of the accused appeared to be surprised. Yarborough looked at his foot as if he did not believe it. Chapius also stated that Yarborough was talking to him at the time that Marshall placed his finger on Yarborough's foot and there was nothing in Yarborough's actions to indicate that he expected to be shot. Chapius believed that Yarborough knew the gun was pointed at his foot, but that Yarborough thought the gun was unloaded. There was a directive that all guns were to be unloaded around the company area, and the directive was enforced.

Chapius stated that he had served with Yarborough on the line in combat from November 1950 to April 1951, as second gunner. In his opinion, Yarborough was a good soldier and a good fighter, and had been awarded a bronze star for valor.

Accused Marshall testified in his own behalf. He had been in the company command post area during the day, and had been with the others at the spring. About an hour previous to the accident he had delivered mail to George Company. He returned to the spring, talked a while, and then went to the tent, which he and Yarborough shared, in the company of Yarborough and Chapius. There they kidded as they usually did, Marshall "messing" with a carbine. He laid the carbine down and Chapius and Yarborough entered the tent and lay down. Marshall went out to see if the "movie" had started.

When Marshall re-entered the tent Yarborough was lying flat on his back, with the soles of his shoes facing the direction of Marshall's entry. Marshall

**682**

was on his knees crawling towards Yarborough's face. Marshall entered the tent at the left side of the opening. Yarborough was in the middle of the tent, and Chapius was on the right side. Two carbines were in the tent lying between Yarborough and Marshall. The muzzles of the carbines were pointing out of the tent; the butts were to the rear of the tent. Marshall, moving toward the rear of the tent, lifted up one of the carbines by the barrel, and it fired. Because he was so surprised by the fact of the gun's discharge, Marshall did not note the exact distance he raised the rifle from the ground. Marshall was unable to state whether or not the floor of the tent had any "rough spots" in it or whether there was anything on which the carbine could have caught.

Marshall admitted having jokingly stated in the presence of Phelps that he intended to shoot himself, but denied making any statement in conjunction with Yarborough that he and Yarborough planned to leave sometime in the afternoon of July 9, 1951. He admitted playing around with a carbine on the afternoon of the day in question and stated that it was possible that he and Yarborough had placed "one another's foot on top of the other under point of a carbine that afternoon." He denied having stated that he was going to Japan the night of July 9, 1951, and admitted that he recalled Private Duckett's testifying that the Criminal Investigation Division was investigating all shooting accidents back of the line. He denied that he said he "didn't give a damn what the CID was investigating." He also denied discussing with Yarborough the possibility of shooting themselves in such a manner as to "get away with it."

Accused Yarborough also testified in his own behalf. On July 9, 1951, after speaking with Lieutenant Barbour at the spring, Private Yarborough returned to his tent. Phelps entered later. Yarborough was talking to Chapius when Marshall picked up a rifle. Yarborough said, "Go ahead and shoot; I don't give a damn," as a joke. Yarborough then left to relieve himself, and returned. Phelps was gone at the time Yarborough returned. Marshall and

Chapius were in the tent, talking. Yarborough lay down, requesting to be awakened when the "movie" started. He closed his eyes. He wasn't paying any attention to what was going on in the tent, and had started to doze off. He did not feel Marshall's hand on his foot, nor did he see Marshall enter the tent. The carbine could have caught on anything, as there was a lot of "junk" in the tent.

On the afternoon of the same day Yarborough had talked with the kitchen driver who told him that he, the driver, might have to go to Seoul that night. Yarborough asked Marshall if he wanted to go to Seoul and Marshall responded, "I'm going tonight if he gets to go." Yarborough asked permission of the First Sergeant to go to Seoul and was told by him that the Sergeant would look into it. Yarborough admitted that he might have said something that day about going to Japan, as he was scheduled for rotation soon, and had been talking about it. He also declared that Private Shriver's testimony that Marshall and Yarborough had played around with a carbine could have been true. He further admitted discussing with Marshall and everybody else how to shoot himself and get away with it, though not seriously. Marshall was present when this was said.

Second Lieutenant Billy S. Barbour stated that he had a conversation with the accused, Yarborough, at the spring on July 9, 1951, in which he told Yarborough that accused was going back "on the hill" (to combat) with Lieutenant Barbour as a runner. Accused questioned Lieutenant Barbour as to the possibility of going back on the hill and taking charge of a squad in order to gain a rating. Lieutenant Barbour told Yarborough that he would do all that he could to get a rating for him.

As to the tactical location of the Command Post of Company H, Captain Stanley Adams stated that he was familiar with the general disposition of the battalion on the line, and that on July 9, 1951, elements of H Company were on the line, but that the entire company was not. The Command Post was about 2000 yards behind the line.

No artillery fire fell on the position from the time it was originally occupied until the date of the trial. Private Shriver stated that H Company was six or seven miles from the front line, and that he did not know whether or not it was within artillery range of the enemy.

As a result of this evidence, Marshall and Yarborough were convicted of (1) conspiracy (with each other) to avoid present duty by inflicting self-injury and, in pursuance of that agreement as an overt act, willfully inflicting self-injury; (2) malingering by inflicting self-injury (Marshall) and deliberately allowing himself to be injured (Yarborough) each in order to avoid the duty assigned; and (3) misbehavior before the enemy through cowardice by inflicting self-injury in order to avoid combat duty.

We shall consider first the sufficiency of the evidence to support the findings. It will be noted that deliberately shooting himself, as to Marshall, and deliberately and knowingly allowing himself to be shot, as to Yarborough, are material elements of each of the specifications. Initially, therefore, we shall consider the evidence to decide whether there is merit to the defense contention that this shooting was purely accidental.

There are several possible explanations concerning this shooting. The first is that Marshall deliberately placed the carbine against his finger and Yarborough's foot and fired the weapon, with full knowledge by Yarborough that the weapon was loaded and that Marshall intended to fire. A second possible explanation is that Marshall assumed the carbine to be loaded and intended to fire it through his finger and Yarborough's foot, but that Yarborough assumed that Marshall had no intention of shooting. A third explanation is that Marshall had no intention of firing the weapon, assumed it to be unloaded, and was merely "play-acting." Finally, there is Marshall's story that he was merely moving the carbine out of his way when it went off accidentally. Only the first explanation will support the findings of the court that Marshall and Yarborough, acting in concert, deliberately inflicted self-injury.

**683**

There was positive testimony that both Yarborough and Marshall had talked of inflicting self-injury, and had enacted the manner in which it could be performed. However, this conversation was characterized, even by the prosecution witnesses, as joking. Decisions as to whether petitioners were serious or not depend a great deal upon the credibility of the witnesses. This the trial court was in a much better position to determine than are we. We can only say that the court could have been justified in determining that there was a serious vein to these threats. Next, the one witness who was present in the tent with Yarborough and Marshall testified positively that Marshall placed his finger against Yarborough's foot and pointed the carbine at his finger. This is, of course, in direct opposition to Marshall's story, that, while crawling across the tent, he lifted the carbine to move it out of the way and it accidentally discharged. We must resolve this conflict in testimony against petitioners. This, therefore, removes the last of the four explanations outlined above. The testimony of this witness is, however, still consistent with the other three explanations. There is no further direct evidence in support of any of these three explanations. Reliance must be based upon inferences drawn from the actions and words of the participants to decide whether (1) Marshall had no intention of firing the carbine; (2) Marshall intended to fire but Yarborough did not intend to get shot; or (3) Marshall intended to fire and Yarborough intended to get shot.

As this Court said in United States v. O'Neal (No. 25), 1 USCMA 138, 2 CMR 44, decided February 7, 1952, "We entertain no doubt whatever of the authority of a court, trial or appellate, to pass on the reasonableness of a jury's inferences —and particularly do we believe this to be true in a criminal setting. Likewise we are certain of our own authority to perform this essential protective function as regards the inferences of a court-martial—and this is quite unaffected by a clear legislative directive away from fact-*finding* power." In assessing the evidence, we determined that we

would be guided by the following test: "We must not reverse unless we believe that reasonable men would be in accord in holding that a rational hypothesis other than that of guilty may be drawn from the evidence." If, therefore, reasonable men would be in accord in holding here that either the second or third explanations of this shooting given above constitute, viewing all the evidence, a reasonable hypothesis, then the findings may not be sustained.

As to Yarborough, the record is clear that he participated in the conversations concerning self-injury. Resolving the conflict in this factor in favor of the Government, as we already have, we must assume that Yarborough did seriously intend, at some undefined date in the future, to inflict self-injury. The evidence as to whether he accomplished that intent at the time of the incident is equivocal. He did nothing to place himself in the line of fire, and made no preparations to be shot. Indeed, all the action pointing in the direction of a deliberate shooting was taken by Marshall. Yarborough remained passive. His conversation and actions were normal. Nothing in the repeated conversations suggests that he contemplated self-injury at the time of the shooting. True, according to Chapius, Yarborough saw Marshall point the carbine at his foot. This was denied by Yarborough. However, even assuming that Yarborough did watch Marshall, there is nothing to indicate that Yarborough knew the weapon was loaded. Indeed, regulations and practice in this unit required that weapons not in use be unloaded. Just a few hours previously, Marshall had deliberately enacted a similar situation with another carbine. If Yarborough actually thought that Marshall was going to shoot, he certainly did not evince any such awareness to Chapius. He continued talking in a normal manner, stated that he planned to sleep for a while, and desired to be awakened when the movie began. It hardly seems possible that a normal person would so casually accept the fact that he was going to be shot. He in no way tensed himself but was, according to Chapius, relaxed. It

684

should be emphasized again that all the action was taken by Marshall. Under these circumstances, it seems completely reasonable that Yarborough assumed that Marshall was merely "play-acting" as he had done earlier. Immediately after the shooting, Yarborough jumped up and shouted that he had been shot—according to Chapius, as though he were completely surprised.

It requires, from this evidence, too many assumptions, without basis in fact, to reach the conclusion that Yarborough deliberately allowed himself to be shot. Where, as here, the conclusion as to Yarborough's guilt must be based upon inferences drawn from equivocal actions, and where there are reasonable hypotheses other than that of guilt, we cannot say that findings are based upon substantial evidence. We think reasonable men would be in accord in saying that it is reasonable to assume from the circumstances surrounding this situation that Yarborough was unaware of any intention on the part of Marshall to carry out the previous threats relating to self-injury.

A more difficult situation is presented as to petitioner Marshall. We cannot, as an appellate tribunal, accept his story that the shooting was entirely accidental in view of the direct contradiction by an eye-witness to the shooting. There remains, therefore, only the possible theory that he deliberately placed the weapon in a position to inflict injury but assumed that the weapon was not loaded and had no intention to actually fire it. There is some support for this view in the evidence. It was established that weapons around the command post were, according to existing orders, kept unloaded although the clip was inserted. The rifle that was fired did not belong to Marshall. He might, therefore, have assumed that it was unloaded. However, this incident took place near the front lines and involved soldiers who were accustomed to keeping their weapons ready for immediate use. The clip was inserted in the rifle. There is no evidence that Marshall made any effort to determine whether or not the gun was loaded. Where weapons are usually kept ready for use and where a clip is readily visible, it hardly seems likely that Marshall—not an inexperienced soldier—would "assume" that the weapon was unloaded without making some further investigation. More damaging yet, Marshall did not advance this theory when he testified in his own behalf. He testified that he did not aim the carbine, but that it went off while he was moving it out of his way. This was directly contradicted, as already noted, by both Chapius and Yarborough. If Marshall did point the rifle as if to shoot without any intention of doing so, it is difficult to understand why he did not so state while testifying in his own behalf. In view of all these circumstances, we cannot say that it was unreasonable for the trial court to have determined that Marshall did deliberately fire the weapon.

We perceive no inconsistencies in our decision as to the evidence. It is not only possible but probable, according to this record, that both of these soldiers did intend to avoid their assigned duty by inflicting self-injury, that Marshall perceived an opportunity to do so and carried out that intent without any immediate knowledge or consent on the part of Yarborough. It is not enough that the court could reasonably have found that Yarborough had the requisite guilty intent, in general, to perform the act at some indefinite time in the future. The specifications alleged, and the Government was bound to prove, that he deliberately carried out that intent at the time of this shooting. Proof of criminal intent alone cannot support conviction for the completed crime. There is insufficient evidence here to support the conclusion that Yarborough deliberately allowed himself, with full knowledge of what was being done, to be shot by Marshall. It follows from this that none of the specifications as to Yarborough can stand. The specifications on malingering and misbehavior allege knowing participation in the act of inflicting self-injury. This is also specifically alleged as the overt act in the conspiracy specification. While the acts of Marshall might have constituted the overt act in the conspiracy

alleged against Yarborough, the specification was not so drawn. The Government was required to prove, under each of the specifications concerning Yarborough, that he deliberately allowed himself to be shot by Marshall. This burden was not met. As to Marshall, we conclude that there is sufficient evidence to support the finding of the trial court that he intentionally wounded himself.

The above discussion demonstrates the adequacy of the evidence to support the conspiracy charge against Marshall. There remain the malingering and misbehavior charges. As to these, we need only consider whether the evidence established the elments aside from deliberate self-injury. Under the malingering charge, it must also be ■■■■■■ ■ proved that the injury was inflicted with the intent to avoid the duty assigned. This element is amply established by the testimony that Marshall stated to others his desire to do anything to get back to Japan. Implicit in such an intention is the desire to avoid the duty he was then performing.

A more difficult question is presented as to the misbehavior charge. The specification under this charge alleges that Marshall did (1) while before the enemy, (2) through cowardice, (3) inflict self-injury, (4) with intent to avoid combat with the enemy. We have already demonstrated that the third element is proven. As to the first element, it was established that ■■■■■■ ■ Marshall was attached to the command post of a company engaged in combat with the enemy. It is true that this command post was located well behind the front lines, but this is not material. Its function was directly related to the tactical operations then going on. The command post was within enemy artillery range, and could have been subjected to infiltrating attack. Marshall's duty was a jeep driver. The test as established in the Manual for Courts-Martial, United States, 1951, paragraph 178, for "before the enemy" is as follows:

". . . Whether a person is 'before the enemy' is not a question of

**686**

definite distance, but is one of tactical relation. For example, a member of an antiaircraft gun crew charged with opposing anticipated attack from the air, or a member of a unit about to move into combat may be before the enemy although miles from the enemy lines. On the other hand, an organization some distance from the front or immediate area of combat which is not a part of a tactical operation then going on or in immediate prospect is not 'before or in the presence of the enemy' within the meaning of this article."

We would have to close our eyes to military realities to hold that a person attached as a jeep driver to a company command post, where units of that company are actually up on the front line engaged in active combat, is not, in a tactical sense, before the enemy. It follows also from this discuission that there is here adequate evidence to support the allegation that Marshall intended to avoid combat duty. The duty to which he was assigned was combat duty. He had clearly evinced an intention to avoid that duty by performing unlawful acts which would result in his being returned to the rear for hospitalization.

These elements, amply established by the evidence, would be sufficient to establish the offense of misbehavior. Malingering in order to avoid assigned duty while before the enemy constitutes misbehavior. Winthrop, Military Law and Precedents, 2d ed, 1920 Reprint, page 623. However, Marshall was not so charged. The specification alleges that *through cowardice* he inflicted self-injury with the intent to avoid combat duty while before the enemy. Cowardice is one form of misbehavior, and puts in issue the motive of the accused. As Winthrop states, "Misbehavior before the enemy is often charged as 'Cowardice;' but cowardice is simply one form of the offence, which, though not unfrequently the result of pusillanimity or fear, . . . may be the result of negligence or inefficiency." Winthrop, supra, page 623. Or, as the Manual states: "Cowardice is misbehavior

through fear. Fear is a natural felling of apprehension when going into battle and the mere display of such apprehension would not constitute the offense, but the refusal or abandonment of a performance of duty before or in the presence of the enemy *as a result of fear* does constitute the offense." Although, as already indicated, Marshall could have been convicted, on the basis of his intentional self-injury, of misbehavior, the Army chose to charge him with misbehavior through cowardice. This put in issue the element of fear and, in order to convict, the court was bound to find that Marshall shot himself in order to avoid combat duty *because he was afraid of such duty.*

We find in this record no evidence of fear unless it be that evidence of an intent to avoid combat duty ▮ itself impels the court to infer fear. This theory we cannot accept. It would mean that fear is synonymous with intent to avoid combat duty. To state the proposition is to demonstrate its fallaciousness. It is common knowledge—indeed, established by this record—that many persons in combat are extremely desirous of gaining a respite from that rigorous duty. Even the bravest man gets tired of fighting. This does not mean that he is, thereby, afraid of the enemy. This record indicates that Marshall had been engaged in combat duty for some eight months prior to the incident in question. There is no proof that he had ever evidenced any form of cowardice.

We do not deny that fear—like any form of mental intent—is difficult of direct proof. However, cowardice while before the enemy is an extremely serious charge, both in terms of the possible punishment and in terms of the degrading nature of the offense which, when found, stays with a person for the remainder of his life. It should require, therefore, more than equivocal acts to convict one of that offense. An intent to avoid combat duty is just as consistent with many other motives as it is with the motive of fear. In the absence of some evidence, direct or circumstantial, that ▮ a person was motivated by. fear, he cannot, in our view, be convict-

ed of cowardice. There is in this record no scintilla of evidence that Marshall was motivated by fear. It is just as reasonable to assume that, sated with fighting, he was motivated by the desire to obtain a respite. This being so, our standard for reviewing the evidence —set out in detail above—requires a holding that there is insufficient evidence to support Marshall's conviction for misbehavior.

Our conclusion as to the evidence leaves only the conviction of Marshall for conspiracy to malinger and for malingering. It is urged by defense that both of these convictions may not stand since they involve improper multiplicity. The Manual for Courts-Martial, United States, 1951, provides that an accused may properly be convicted of both a conspiracy to commit an offense and the substantive offense itself, even when the overt act alleged in support of the conspiracy charge consists of the commission of the offense. Manual for Courts-Martial, United States, 1951, par 160. This is consistent with the Federal rule. Pinkerton v. United States, 328 US 640, 90 L ed 1489, 66 S Ct 1180; Upshaw v. United States, 157 F2d 716 (CA10th Cir). The only prohibition against multiplicity contained in the Manual is that voiced in paragraph 76a (8) which states that the maximum sentence may be adjudged only for separate offenses. The test to be applied in deciding whether the offenses ▮ are separate is whether each offense requires proof of an element not required to prove the other. This rule has also been applied by the Federal courts. Morgan v. Devine, 237 US 632, 59 L ed 1153, 35 S Ct 712; Gavieres v. United States, 220 US 338, 55 L ed 489, 31 S Ct 421; Upshaw v. United States, supra. Here, the conspiracy charge requires ▮ proof of an agreement between Marshall and Yarborough, an element not material in the charge of malingering laid against Marshall alone. Malingering involves the intent to avoid duty—an element not required for conspiracy. There is, therefore, no basis for the claim of multiplicity as to these two offenses.

Defense, however, endeavors to in-

**687**

voke quite another rule in order to attack the legality of the con- █ spiracy charge. It is urged that a charge of conspiracy will not lie where the substantive offense itself involves concert of action. We have no quarrel with this general proposition. It has sound basis in both logic and law and has been consistently applied to such offenses as dueling, bigamy, incest, adultery, and bribery. See United States v. Holte, 236 US 140, 59 L ed 504, 35 S Ct 271, LRA1915D 281; United States v. Katz, 271 US 354, 70 L ed 986, 46 S Ct 513; United States v. Burke, 221 Fed 1014 (CA2d Cir); United States v. Sager, 49 F2d 725 (CA 2d Cir); Wharton, Criminal Law, 12th ed, Section 1604. However, the rule has no application here. Marshall was charged with conspiring with Yarborough to malinger by inflicting self-injury, and with malingering by shooting himself in the finger with a carbine. The substantive offense, as to him, required no concert of action, or agreement with another party. Where the offense is capable of commission and has been committed by a single individual, the doctrine relied on by defense does not apply. Chadwick v. United States, 141 Fed 225 (CA6th Cir); Laughter v. United States, 259 Fed 94 (CA6th Cir); Lisansky v. United States, 31 F2d 846 (CA4th Cir). To apply the rule as urged by defense would be to reach the untenable result that a conspiracy to commit any felony would not lie where the conspirators themselves accomplished the felony. We conclude that there is no legal bar to a conviction of Marshall for both conspiracy to malinger and the malingering itself.

Our decision in this case requires that all charges and specifications against petitioner Yarborough be dismissed. The charge and specification alleging misbehavior through cowardice by petitioner Marshall are dismissed. The case is remanded, as to petitioner Marshall, to The Judge Advocate General of the Army for referral to a board of review for action not inconsistent with this opinion.

Judge BROSMAN concurs.

LATIMER, Judge (concurring in part and dissenting in part):

**688**

I concur in part and dissent in part. There are separate specifications in this case and they are drawn so that each accused appears to have been charged with a separate and distinct crime. Were it not for that, the general principles applying to criminal conspiracy to the effect that one cannot conspire with himself and that one overt act would bind all conspirators would apply, but, because of the manner in which the crimes are charged, and, in fairness to accused Yarborough, he should only be required to defend against the particular specification which was directed toward him. Undoubtedly the specification charges him with the same general plan or agreement as that charged against Marshall, but he is alleged to have been connected with the scheme by but one specific overt act. It is, as I interpret the Court's opinion, failure to prove that element which brings about a reversal as to the one conspirator and at the same time requires affirmance as to the other. Yarborough having been charged by a separate specification, undoubtedly is entitled to rely on failure of the Government to establish the sole overt act alleged against him. For the purposes of this case, I shall accept that premise and relate the evidence which I believe sufficient to establish that as to both accused the findings should be sustained.

The specification referring to Yarborough reads as follows:

"In that Private John W. Yarborough . . . did at Chokkun-Dong, Korea on or about 9 July 1951, conspire with Private First Class Herman Marshall to commit an offense under the Uniform Code of Military Justice, to wit: to intentionally inflict injury upon himself in violation of Article 115, and in order to effect the object of the conspiracy, the said Private John W. Yarborough did place himself in line of fire and did then allow the said Private First Class Herman Marshall to shoot him in the foot with a carbine."

As the majority opinion points out, there is ample evidence to sustain the finding that there was a general plan

and agreement between Yarborough and Marshall. That leaves the sufficiency of the evidence to establish the overt act as the line of departure between myself and the other members of the Court. In order to portray clearly the facts and circumstances lending color to my version, I will first summarize the evidence of the Government as for the most part it is undisputed by Yarborough, except as to some particularities immediately preceding the shooting. As to those instances I will mark out the boundaries of the dispute. Then I shall relate the versions of the three eyewitnesses to the injury.

Marshall had been a noncommissioned officer but was reduced in grade because of having overstayed his leave. He was worried because of conditions at home and was concerned about a letter he had received from his girl. His evidence was vague and uncertain concerning his acts and conduct during the afternoon and evening and his answers to questions were equivocal. I merely mention these matters as they are influential on the weight the court-martial would give to his testimony.

Earlier in the afternoon of July 9, 1951, a group of five or six soldiers from the same company, including Yarborough and Marshall, had assembled at a spring and were drinking some beer. Some of the individual soldiers came and left and the unfortunate drama unfolds over a period of several hours. Part of the statement I allude to and events I mention were made or occurred at the spring, and others in the tent. Without trying to relate them in sequence, or fix the exact time or locale, except those immediately preceding the shooting, I shall merely point them out as they were all in the presence of Yarborough. During the afternoon Marshall and Yarborough were talking about going to Japan. Marshall picked up a weapon and pointed it at Yarborough's foot. Yarborough said "Go ahead. I don't give a damn." One of the other soldiers spoke up and said in substance: You better not, all accidents are being investigated by the Criminal Investigation Division. Both Marshall and Yarborough replied that that did not make any difference to

them, they were going to Japan that evening and did not care how they went. During the afternoon Marshall and Yarborough were discussing ways of shooting themselves without being detected. Approximately one hour before the shooting they were in their tent; they overlapped their feet so that the foot of one was over the foot of the other and Marshall pointed the carbine so that if it were fired, it would pass through both feet. About the same time they were discussing the various ways in which they could shoot themselves with one round. During this particular discussion and demonstration one witness left because as he stated, he "did not like to be around parties playing with firearms."

The shooting occurred in a pup tent which was approximately six feet by four feet. At the time of injury there were three persons in the tent, Yarborough, Marshall and Chapius. They were friendly and there was no ill feeling existing. The tent was normally occupied by Yarborough and Marshall as sleeping quarters. Chapius and Marshall were in a supine position, with the upper portions of their bodies raised on their elbows. The three parties had been carrying on a general conversation and in one of the sideline discussions between Marshall and Yarborough they mentioned going to Seoul or Japan. At least one carbine with a magazine inserted was lying in the tent. It was handled by Marshall, fired or discharged by him, and the projectile travelled through the right index finger of Marshall, who was right-handed; and the large toe of Yarborough's right foot.

Before relating the facts immediately surrounding the shooting, in fairness to Yarborough's contention, I should mention that the witnesses who furnished the evidence related above, indicated they believed the two participants were joking when they were talking and simulating self-injury; but, they were all friendly to both Marshall and Yarborough and hardly anyone would expect a soldier to be other than in a joking mood in such a matter until he performed some act showing a different mental attitude. Be that as it may, that question was placed squarely before the

court-martial, and it was resolved contrary to the contention that it was all in fun.

There are three versions of the detailed incidents in the tent immediately preceding the shooting and this is the only evidence which was in substantial conflict. Chapius' version was as follows: There had been discussions between Marshall and Yarborough about injuring themselves and going away; that he, Marshall and Yarborough were all in the tent and for some substantial period of time immediately preceding the shooting no one left; that he and Yarborough were lying parallel to each other; Yarborough was in a reclining position resting on his elbows, and the three parties had been conversing and all were awake; that Marshall was sitting opposite the hips of Yarborough and at the time of shooting facing toward Yarborough's feet; that Marshall took the carbine, held it with his left hand with the hand on or near the trigger guard and the stock by his leg; that he placed his right hand, palm toward Yarborough's head, over the right foot of Yarborough with his index finger of the right hand over the right large toe of Marshall; that he placed the muzzle of the weapon about an inch from his finger and fired; that Yarborough knew the weapon was pointed at his toe; that Yarborough was shot through the big toe on the right foot and Marshall was shot through the right index finger; that Yarborough appeared surprised and said "I'm hit"; that Yarborough made no comment to Marshall about Marshall having shot him.

Marshall's version is substantially as follows: He claims to have left the tent for a short period of time; that he returned, started to crawl back in the tent between Yarborough and Chapius, saw the carbine on the ground, picked it up by the muzzle and moved it, and as it was being moved, it fired. I hardly need to characterize Marshall's story as being doubtful and, of course, he had considerable difficulty in explaining how he could lift a weapon with his right index finger over the muzzle, and at such an angle with the ground and Yarborough's position that the path of the 690

bullet would pass through his finger and Yarborough's toe.

Now as to Yarborough's version: He does not deny having made any of the statements attributed to him, nor does he dispute that he participated in any of the acts in which he and Marshall took assumed positions which would permit both to be injured by one round. He sought to avoid their effects by claiming that he and Yarborough were playing. He does not dispute the warning he was given about the Criminal Investigation Division investigating accidents and his reply that he did not care; he merely states he could not remember. This is his story concerning the actual shooting:

"About 5:30, something like that. Phelps came on in the tent and asked me about Lieutenant Barbour's sending me back up the hill. We joked around in the tent there awhile. I was talking to Chapius. Marshall picked up a carbine; I wouldn't say whose it was. I said, 'Go ahead and shoot; I don't give a damn.' And then I went out of the tent again . . ., when I came back, Phelps was gone. Marshall and Chapius was in the tent. They were talking about something. I laid down and said, 'Wake me up when the movie starts.' I just closed my eyes. When it happened, I knew I was hit in my foot. I grabbed my shoe and that's all I know about what happened."

I need not point out how, nor in what way, Yarborough's evidence contradicts that of other witnesses and that the right to believe or disbelieve his story is a function that belongs to the court-martial. Neither need I repeat my reasons for not accepting the rationale of United States v. O'Neal (No. 25) 1 USCMA 138, 2 CMR 44, decided February 7, 1952. They can be found in my dissenting opinion in that case. Moreover, it would be of little value as a precedent for me to analyze the facts and show the reasonable inferences the court-martial could draw in this type of offense where the one using the gun must be active, the other passive. For the purpose of this case, I will leave it to the perspicacity of those who read

this opinion, to assume as this Court has found, that Yarborough participated in conceiving and creating the plan to permit himself to be shot, and then to determine whether the members of the court-martial could reasonably find from the related evidence, beyond a reasonable doubt, that Yarborough was a willing victim to the shooting. I have concluded they could and, therefore, dissent from that portion of the decision of the Court which is contrary to the views expressed by me.