UNITED STATES, Appellee

v.

ROBERT J. TILTON, Private First Class, U. S. Army, Appellant

4 USCMA 120, 15 CMR 120

CAPT William C. Irby, Jr., U. S. Army, 1ST LT Robert C. Taylor, U. S. Army, and 1ST LT Wade J. Dahood, U. S. Army, for Appellant.

LT COL William R. Ward, U. S. Army, and 1ST LT Benjamin C. Flannagan, U. S. Army, for Appellee.

## Opinion of the Court

PAUL W. BROSMAN, Judge:

A general court-martial convened in Korea found the accused guilty of a violation of the Uniform Code of Military Justice, Article 85, 50 USC § 679, in that on March 1, 1953, he had deserted his unit with intent to avoid hazardous duty. The convening authority approved the sentence to dishonorable discharge, total forfeitures, and confinement at hard labor for ten years, but suspended the execution of the dishonorable discharge. A board of review affirmed this action, but The Judge Advocate General, United States Army, remitted the confinement in excess of five years. Our grant of the accused's petition for review included both sufficiency of the evidence to support the findings of guilty, and the possibility of instructional error.

## II

Uncontradicted Government evidence —fully corroborated by the accused's judicial admissions—disclosed that from March 1 until March 6, 1953, he was in a status of unauthorized absence from his company. According to his platoon leader, a Lieutenant Goudelock, this absence had been preceded by notification by the latter that on March 1 the accused "was to go on a listening post"—a duty which the court-martial could permissibly have found to be hazardous. According to Lieutenant Goudelock, he had located the accused fast asleep in the "sleeping bunker" of the platoon command post, and had informed him of the listening post assignment. The single but substantial vice in the prose-cution's case has to do with the failure of Lieutenant Goudelock's testimony to indicate with specificity that he had awakened the accused and made sure that he had regained consciousness sufficiently to receive and act on the information given him.

The accused denied categorically having been told at any time by Lieutenant Goudelock that he had been assigned listening post duty on March 1. He testified that after awakening from his nap in the platoon "sleeping bunker," he had departed for a rear area to advise with a chaplain concerning his rotation point situation—and without any sort of knowledge that an attempt had been made to arouse him. According to his further testimony, he was unable to locate and consult the chaplain for several days. As soon as he had done so, he returned voluntarily to his organization. The accused recounted much prior combat experience, and asserted that he had served on listening posts on many previous occasions, and did not regard the duty as particularly dangerous. Defense witnesses stated that on March 23—subsequent to the alleged offense—the accused had performed especially hazardous duty. No rebuttal witnesses were called.

## III

The Government has urged vigorously that, if Lieutenant Goudelock had found the accused sleeping and had intended to inform him of a military assignment, the officer would, within the framework of normal duty performance, have assured himself that the ac-

cused was aroused and knew of the duty. Perhaps he would—and did. But perhaps he did not do so. Experience tells us that individuals differ sharply in the depth of their slumber. Some are rarely able to leave consciousness far behind, while the task of awakening others requires strenuous and continued effort. Moreover, the role of physical exhaustion—and its possible existence in the factual background of this case—cannot be left out of account.

We are unwilling to believe that we should permit findings of guilty of a capital offense to hinge on speculation and conjecture of this nature.

Had Lieutenant Goudelock testified in any appropriate manner to the effect that he had aroused the accused and had *communicated* to him the duty assignment involved, a simple question of fact would have resulted—one beyond the scope of review in this Court. But he did not do this. "In proving a specification alleging that the accused quit his unit or organization or place of duty with the intent to avoid hazardous duty or with the intent to shirk important service, there should be evidence of facts raising a *reasonable* inference that the accused *knew* with reasonable certainty that he would be required for such hazardous duty or important service." Manual for Courts-Martial, United States, 1951, paragraph 164a, page 314. (Emphasis supplied.) No such facts were shown here.

Government counsel have placed great stress on the use of the word "conversation" during the testimony of the prosecution's two witnesses. How, they inquire, could Goudelock have "conversed" with the accused in the absence of consciousness on the latter's part? We are without disposition to deny that the term "conversation" ordinarily implies reciprocal conduct between two or more persons—with all parties cognizant, at least generally, of the matters under discussion. However, we observe that on each of the two occasions the word "conversation" appeared in testimony, its use occurred in the course of the same leading question directed by trial counsel to both of his own witnesses. In each instance, too, the question evoked no more than a brief affirmative answer. Since to a certain extent trial counsel himself was testifying through leading questions which utilized the crucial term, the reasoning suggested by Government counsel seems inappropriate. Furthermore, when each witness recounted that which was said during the "conversation" between Goudelock and the accused, the account included what the lieutenant said and no more. No witness testified that the accused made any response whatever. In other words, both witnesses seem to have interpreted the word—as used in the trial counsel's leading questions—to mean merely that *something* was said by *someone*, and not that *two* people were engaged in a verbal interchange.

The deficiency in the Government's case is highlighted by the circumstance that the accused had willingly performed hazardous duty on frequent occasions, both before and after the offense alleged here. His uncontradicted evidence on this score, and his denial that he had been awake at the time Lieutenant Goudelock is said to have instructed him, together with the frailty of the prosecution's case, all compel us to conclude that the evidence here was wholly insufficient to show knowledge of the hazardous duty.

We cannot forget that the accused has been convicted of a disgraceful—as well as a capital—crime. Nor do we entertain doubt "that reasonable minds, as triers of the fact, must be in agreement that reasonable hypotheses other than guilt could be drawn from the evidence." Stoppelli v. United States, 183 F2d 391, 393 (CA 9th Cir); United States v. O'Neal, 1 USCMA 138, 2 CMR 44. Without knowledge of the duty, the accused cannot have intended its avoidance. We recognize, of course, that every inference must be indulged in support of the finding of a court-martial. However, we feel that the effect of such a rule is neutralized in the instant case chiefly because of the necessity for basing those supporting inferences in turn on others arising from affirmative and possibly uninformed answers to improper leading questions.

122

## IV

In view of our disposition of the first assignment of error, it is unnecessary that we consider the second. This is true for the reason that the defense's claim of misdirection relates solely to the offense of desertion. Accordingly, only so much of the court-martial's finding as finds the accused guilty of absence without leave is affirmed, and the record of trial is remanded for possible reconsideration of sentence.

Chief Judge QUINN concurs.

LATIMER, Judge (dissenting):

I dissent.

Much ado is made in this case because the offense alleged permitted the imposition of a death sentence. In view of the posture of this record, I wonder how that influences the sufficiency of the evidence. Appellate courts are particularly solicitous of the rights of an accused and search a record for all errors of substance, whether raised or not, where the death sentence has been imposed, but I gravely doubt they adopt any such procedure in those cases when a defendant is charged with murder and found guilty of negligent homicide. The matter of moment to the appellate court is the sentence, not the charge. Here the accused is before us with a sentence of five years' imprisonment after having pleaded guilty to an offense which permitted the court-martial to sentence him to confinement for life. He is only entitled to the same consideration as any accused with an equivalent sentence, regardless of the original charge. The suggestion that we should not permit a capital offense to hinge on speculation and conjecture adds nothing of a convincing nature to the opinion. No conviction of a criminal offense can be sustained on a surmise or guess. Why then the emphasis on the gravity of the offense? After all, there is only one question which concerns us and that is the sufficiency of the evidence to sustain the finding, and I use the same measuring rod as I do in other cases with similar sentences.

It would be of little value for me to assert there is sufficient evidence to sustain the findings without documenting the assertion and so I will quote the evidence from the record. The command post of the platoon was divided into two sections, one section was the command post where the platoon personnel carried on their military duties, the other was used for sleeping purposes when the men were off duty. The platoon leader, Lieutenant Goudelock, testified as follows

"Q: Tell us when and where you saw him?

A: I saw the accused in my platoon CP. The platoon CP is divided in two sections. One is the sleeping bunker and the other is the platoon headquarters. The accused was sleeping in my platoon CP sleeping bunker when I told him that he was to go out on an LP. This was about 3 o'clock when I told him.

. . . . .

"Q: Did you assign the accused to any particular listening post?

A: Yes sir. I assigned him to LP No. 14. That was a right flank LP about 450 yards from the left finger by Pokkae which is a hill occupied by the Chinese.

"Q: You say that you had a conversation with the accused about 1500 hours?

A: Yes sir.

"Q: What instructions did you give him?

A: I told him that he was to go on a listening post and that he was to report to the platoon CP at 1800 hours."

On cross-examination by defense counsel, Lieutenant Goudelock testified:

"Q: You stated, Lieutenant Goudelock, that you gave the accused instructions as to LP 14?

A: I gave him instructions to be on LP 14 and that he was to report to CP by 1830 hours.

. . . . .

"Q: You said that you gave the accused instructions to report back to the CP at 1830 hours. Was that your platoon CP?

A: Yes sir."

Sergeant First Class Kuzmick testified:

"Q: Calling your attention again to 1 March 1953, did you have occasion to see the accused that day?

A: I seen Pfc. Tilton that day.

"Q: Tell us when and where you saw him?

A: At the platoon CP.

"Q Was anyone else present?

A: Lieutenant Goudelock.

"Q Was there any conversation?

A: There was sir.

"Q: Tell us in your own words what was said? ‾

A: The accused was informed that he would have LP that night and that he was to report to the platoon CP at 1830 hours."

Suppose we pause at this point and consider the stories as related by the two government witnesses. My associates say it is reasonable to conclude the accused was asleep. Of course, one can always conclude that a conversation was not a conversation and that an officer carried on a monologue while an enlisted man, whom he had specifically contacted to make certain he reported for duty, lay sleeping on his bunk. Furthermore, the sergeant, who witnessed the incident could have been in error about the conversation. He, too, could have misunderstood the meaning of the word "conversation" as he only mentioned the order given by the Lieutenant. I have not overlooked the suggestion that the evidence was obtained by leading questions and, therefore, of little weight. I know not why. I assume that if a witness is asked if he had a conversation, there is no objection to the question, and he answers "Yes," that the evidence is competent and a reasonable person would conclude he had a conversation. Furthermore, I assume the defense counsel in cross-examination might escape my brothers' restricted view of leading questions. In answer to one of his questions, the Lieutenant stated that he gave the accused instructions to be on Listening Post 14 and to report to him at the command post at 6:30 pm. It was then 3:00 o'clock in the afternoon. I concede the officer neglected to say that when he gave the order he prefaced it by asking the accused if he were awake, but human behavior suggests to me that the officer was not talking to himself.

If the evidence is sufficient at this point to sustain the finding, then the problem is whether the evidence of the accused compels a finding of innocence. This is his story. He had been on rest and recreation leave and he returned to platoon headquarters at 10:00 o'clock in the morning of March 1, 1953. He reported to the unit administrator at the company command post and then proceeded to the sleeping bunker. He fell asleep and upon awakening some time during the afternoon he felt "sick and all shaken up," and "nervous." Without notifying anyone in the platoon command post and without clearing with the unit administrative officer who was only 400 to 600 yards to the rear, he caught a ride in a jeep belonging to another company and proceeded to the battalion command post to see the chaplain. When asked why he went to see the chaplain, he answered "at the time I felt sick and all shaken up, I thought it would be best to see the Chaplain." When asked if he desired to see the chaplain for any other purpose he stated "I wanted to find out when I was to rotate." He stayed in the rear area for five days, sleeping and living in a wire supply tent. The person whom he knew possessed the information about his rotation points was the unit administrator in the company area. He did not consult with him because he "felt rotten and just didn't stop." He informed a person by the name of "Matt" that he did not feel well, but he made no attempt to report his condition to any officer or noncommissioned officer of the platoon, and did not report to any medical installation—this in spite of the fact that he was apprised of the location of medical installations, and they were readily accessible.

The evidence as to his service speaks for itself. He testified he had been on listening posts fifteen times but, according to his own statement, there was

nothing hazardous about that service. He did not identify the location of the posts, but they were not in the dangerous area with which we are concerned. He had not performed any duty in that locality. When asked if he had been in combat, he said he had been, but when narrowed down by questioning, he stated "I wasn't exactly there, but I was near there, I was not in the assault." Some two weeks after he was charged with this offense, the troops in the forward area suffered sufficient casualties that the personnel in rear areas were ordered forward to evacuate the wounded. The accused assisted in that evacuation.

In some instances when an accused has testified consistently and his story has been corroborated by independent circumstances, we have held the record insufficient to sustain the finding of desertion. See United States v. Peterson, 1 USCMA 317, 3 CMR 51. But I suggest we analyze accused's story to determine if it is persuasive and compelling. This was his first day in a dangerous area after he returned from leave; he awakened sometime during the afternoon; he was sick, shaken, and nervous; he left his place of duty to get to the rear to consult with the chaplain about his health and rotation; he reported to no one officially; he made no attempt to report for sick call; he admitted going absent without leave; he had medical assistance immediately available, but never sought it; his source of information on rotation was close at hand, but he ignored it; he stayed in a place of relative safety for five days to talk to a chaplain about information that could be obtained firsthand in the forward area; and, he lived in a supply tent in a wire communications section. The only evidence given by him which is corroborated is that which relates to his service in evacuating wounded personnel some fifteen days after he was charged with this offense.

I wonder if, in view of all the evidence, it would be unreasonable to conclude that accused knew of his assignment to a dangerous listening post and that this knowledge brought on his sickness, nervousness, and subsequent departure for the rear. I conclude it would not be unreasonable and I would, therefore, affirm the finding.